[No. 66686-5. En Banc.]
Argued September 7, 2000. Decided April 19, 2001.

*In the Matter of the Personal Restraint of* CAL COBURN
BROWN, *Petitioner*.

432

*Gilbert H. Levy* and *Jeannette D. Jameson*, for petitioner.

*Norm Maleng, Prosecuting Attorney*, and *Deborah A. Dwyer, Ann M. Summers, Lee D. Yates*, and *Cynthia Gannett, Deputies*, for respondent.

SMITH, J. — Petitioner Cal Coburn Brown, now awaiting a sentence of death at the Washington State Penitentiary at Walla Walla, on April 30, 1999 filed with this court a personal restraint petition under Rules of Appellate Procedure 16.3-16.15 challenging the lawfulness of his confinement under his December 10, 1993 King County Superior Court conviction for aggravated murder in the first degree

and his January 28, 1994 sentence of death.[1] This court in a majority opinion affirmed the conviction and sentence on July 24, 1997.[2]

## QUESTIONS PRESENTED

The questions presented in this personal restraint petition are:

(1) Whether Petitioner was deprived of effective assistance of counsel during the guilt and penalty phases of his trial and on direct appeal to this court;

(2) Whether there is newly discovered evidence which entitles Petitioner to a new capital sentencing hearing;

(3) Whether this court's denial of funding for a psychiatrist during postconviction proceedings and the trial court's limited funds for experts deprived Petitioner of due process guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution;

(4) Whether RCW 10.95.070(1) violates the Eighth and Fourteenth Amendments to the United States Constitution because the word "relevant" in the statute is vague when interpreted in the context of Petitioner's "prior criminal activity"; and

(5) Whether Petitioner's sentence of death was imposed arbitrarily because of budgetary constraints in violation of the "cruel and unusual punishment" clause of the Eighth Amendment to the United States Constitution.

## STATEMENT OF FACTS

Petitioner Cal Coburn Brown is a "death row" resident at the Washington State Penitentiary at Walla Walla, Washington.

On June 11, 1991, Petitioner was charged by information in the King County Superior Court with aggravated murder

---

[1] *See* ch. 7.36 RCW; RAP 18.22.

[2] *State v. Brown*, 132 Wn.2d 529, 940 P.2d 546 (1997).

in the first degree for the death of Ms. Holly C. Washa.[3] The trial court appointed Ms. Lin-Marie Hupp, Terry L. Mulligan and Kern W. Cleven as counsel to represent him.[4] Prior to his jury trial before the Honorable Ricardo S. Martinez, Petitioner made statements to police detectives in Palm Springs, California in three interviews which were recorded without his knowledge on May 27 and 28, 1991.[5] On September 10, 1992, his counsel filed in the trial court a motion to suppress Petitioner's recorded statements under CrR 3.5.[6] The motion was denied by Judge Martinez on September 15, 1992.[7]

Guilt phase testimony began on November 30, 1993.[8] On December 10, 1993, the jury returned a verdict of "guilty" of premeditated murder in the first degree, finding that Petitioner committed the murder to conceal commission of a crime or to protect or conceal his identity; and found aggravating circumstances of robbery in the first or second degree, rape in the first or second degree and kidnapping in the first degree.[9]

The penalty phase of the trial began on December 15, 1993.[10] After the State gave its opening statement, Petitioner's counsel elected to defer their opening statement until after the State presented its evidence.[11] The State then elicited the following testimony from Detective Earl Lee Tripp of the King County Police:

Q. Would you give your name again for the record, please?

A. My name is Earl Lee Tripp, T-r-i-p-p.

---

[3] Clerk's Papers at 1-2; *State v. Brown*, 132 Wn.2d at 549.

[4] *See* Clerk's Papers at 10-15, 56.

[5] *State v. Brown*, 132 Wn.2d at 543, 549.

[6] Clerk's Papers at 517-44.

[7] Report of Proceedings (Sept. 15, 1992) at 47-55.

[8] *State v. Brown*, 132 Wn.2d at 549.

[9] *Id.* at 549-50.

[10] *Id.* at 550.

[11] Report of Proceedings (Dec. 15, 1993) at 42-44.

Q. And, Detective Tripp, do you have in front of you a list of the record of convictions of Cal Coburn Brown?

A. Yes, I do.

Q. And would you read them slowly to the jury, please?

A. Superior Court of State of California, County of Santa Clara, September 19, 1979, plea of guilty to assault with a deadly weapon. Date of crime, April 9th, 1977.

Q. Would you wait one moment. And the next one is what?

A. Superior Court of State of California, County of San Luis Obispo, March 11th, 1981, plea of guilty to grand theft.

Q. And the next one?

A. Circuit Court of the State of Oregon, Benton County, January 6, 1984, found guilty by jury, attempted assault in the first degree, assault in the second degree.

Q. And the next one, please?

A. Superior Court of State of California, County of Riverside, August 30th, 1991, plea of guilty to the following: Attempted murder in the first degree, aggravated mayhem, torture, robbery in the first degree, false imprisonment.[12]

. . . .

Petitioner then offered mitigating evidence for the jury to consider in determining his sentence.[13]

Petitioner was authorized in excess of $24,570.00 by the trial court to retain services of four experts to testify during the guilt phase of his trial. Ms. Denise Ferry, described by defense counsel as a "death penalty mitigation specialist," was authorized for payment of $4,982.73 on September 24, 1992, $4,971.93 on October 15, 1992 and $5,045.34 on April 8, 1993, for a total of $15,000.[14] On October 23, 1992, Dr. Lloyd I. Cripe, Ph.D., a clinical neuropsychologist, was authorized for payment up to $3,000.00 for a neuropsycho-

---

[12] Report of Proceedings (Dec. 15, 1993) at 44-46.

[13] *State v. Brown*, 132 Wn.2d at 551.

[14] Clerk's Papers at 408, 594-95, 609, 627-43, 725-29 (all sealed except for page 609).

logical examination of Petitioner.[15] On March 25, 1993, Dr. Roland D. Maiuro, Ph.D., was authorized for payment up to $4,620.00 to perform a psychological evaluation of Petitioner.[16] On September 8, 1993, Dr. Anthony J. Cedoline, Ph.D., a licensed psychologist at the school where Petitioner attended seventh and eighth grades, was authorized for payment up to $1,950.00 for his expert services.[17] The trial court also authorized payment for some of these experts who would testify in the penalty phase.[18]

In an "Affidavit in Support of Request for Authorization of Expert Services at at [sic] Public Expense,"[19] defense counsel, in referring to Dr. Roland Maiuro, Ph.D., stated:

> Dr. Maiuro is the Director of the Anger Management and Domestic Violence Program at Harborview Medical Center/ Mental Health Center and Associate Professor in the Department of Psychiatry and Behavioral Sciences at the University of Washington School of Medicine. His specialty is in the area of violence resulting from mental illness. He has experience in capital cases as an expert for trial and penalty phases.[20]

Dr. Maiuro testified that in his opinion Petitioner suffered from antisocial personality disorder, sexual sadism, and manic syndrome.[21] He testified that records of lithium treatment while Petitioner was in prison in Oregon indicated the drug produced some progress in stabilizing his manic mood disorder, but concluded the state of Oregon did not adequately monitor Petitioner's continued use of lithium after he was paroled.[22]

In the penalty phase the State offered in rebuttal the

---

[15] *Id.* at 610-20 (sealed).

[16] *Id.* at 716-23 (sealed).

[17] *Id.* at 787-90.

[18] *See, e.g., id.* at 4363-64.

[19] *Id.* at 709-15 (sealed).

[20] *Id.* at 713 (sealed).

[21] *State v. Brown*, 132 Wn.2d at 552.

[22] *Id.*

testimony of a psychiatrist, Dr. John R. Brinkley, M.D., who testified in part:

> Well, as I think I indicated earlier, I had no clear indication from the records I reviewed that [Petitioner] had a disorder for which lithium was appropriate.[23]

On December 27, 1993, the jury returned a verdict finding there were not sufficient mitigating circumstances to merit leniency.[24] The trial court on January 28, 1994 imposed upon Petitioner a sentence of death as required by statute.[25]

On January 2, 1994, Dr. Brinkley wrote a letter to the King County Prosecuting Attorney asking payment of $4,070.00 for "psychiatric expert services in the case State v. Brown."[26] and ended his letter with this statement:

> I derive satisfaction from contributing to the outcome of this case, and would be delighted to work with you in the future should the opportunity arise.[27]

On July 19, 1995, Judge Martinez signed the following "Certificate Pursuant to CrR 3.5 of the Criminal Rules for Superior Court":

> The undersigned judge of the above court hereby certifies that a hearing has been held in the absence of the jury pursuant to Rule 3.5 of the Criminal Rules for Superior Court, and now sets forth:
>
> A. FACTS OF THE CASE
>
> On Monday, May 27, 1991, the defendant Cal Brown was walking near a hotel in Palm Springs, California, where he had slashed a woman's throat a few hours earlier. Brown had left his victim inside the hotel because he wanted to obtain some first aid equipment for her gaping throat wounds. She was

---

[23] Report of Proceedings (Dec. 21, 1993) at 109; see State v. Brown, 132 Wn.2d at 553.

[24] Id. at 550.

[25] Id.

[26] Vol. 1 of App. to Personal Restraint Pet.

[27] Id.

waiting in the hotel room, with her feet handcuffed together and tied to the bed. Brown had wrapped her bleeding neck with her sanitary napkins held on with her nylon stockings. Believing that this might not be enough to keep her alive until the banks opened on May 28 (at which time Brown planned to withdraw money from the victim's checking account), Brown sought more bandages. The victim somehow reached the telephone (Brown had left her hands free) and notified police.

Police responded to the hotel, and the victim gave them a description of her attacker, whom she knew as Cal Brown. Palm Springs Police Officer G.A. Haas saw a man who fit the description walking outside the hotel. Officer Haas walked up to the man and asked his name. Brown responded, "Cal." Haas asked Brown where the knife was. Cal Brown answered, "In my right front pocket." Haas asked him what his last name was. The defendant replied, "Brown." Haas then arrested Cal Brown on suspicion of attempted murder, and removed the knife from Brown's right front pocket.

Subsequently, Brown was transported to the Palm Springs Jail by another officer. He went through the normal booking procedures incidental to his being incarcerated in the jail facility. In addition, a nurse was called and hair, blood and saliva samples were taken from Brown for subsequent examination; this was part of the processing to complete a "suspect rape kit." Officer Haas was present during this procedure. When Brown became aware that samples were to be taken, he asked Haas, "What's this for?" Haas told him it was regarding the alleged rape of Susan Schnell. Brown said, "Is that all? I thought it was for the other thing. I thought this was going to be more serious, you know, because of the other thing." Officer Haas had not advised the defendant of his rights prior to any of his statements. Except for the initial contact outside the hotel, Haas had asked the defendant no questions. The first advisement of rights took place during a subsequent interview with Mark Harvey and Al Franz, detectives assigned to the case.

At about 1120 hours on 27 May 1991, Detective Mark Harvey and his partner, Detective Al Franz, contacted Brown. They conducted three interviews with Brown: the first was in the morning on May 27, 1991 (beginning at 11:20 A.M.); the second was in the evening on May 27 (beginning at 7:55 P.M.); and the third was in the afternoon on May 28 (beginning at noon). The

first two interviews were initiated by the detectives. Brown contacted the detectives on May 28 and requested the third interview. Before each of the interviews, Detective Harvey advised Brown about all of the Miranda warnings. [*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966).] After the warnings were explained to him at the inception of each interview, Brown told Harvey that he wanted to talk with the detectives. Each interview was taped, in accordance with California statutes that allow police to tape record their interviews with suspects without the suspect's knowledge or consent. According to Detective Harvey, it is the practice of the Palm Springs Police Department to record interviews with suspects in all cases where the crime is a serious one.

Detective Harvey asked most of the questions of Brown, and Harvey was present at all times during each of the three interviews with Brown. Detective Franz sometimes left the room during the interviews. Harvey characterized the defendant as an intelligent person, who had a good grasp of language and was very capable of communicating. Harvey saw no indications of intoxication when he interviewed Brown.

Brown gave Detective Harvey a full confession to both crimes: he admitted that he slashed the throat of the young woman in Palm Springs, and he admitted that he kidnapped, robbed, tortured and killed Holly Washa at SeaTac Airport in Seattle, Washington.

Following the first interview, Detectives Harvey and Franz received information about a crime the defendant had committed in King County, Washington. He told them to get in touch with King County after he had given details about that crime. There was contact between the two agencies and, after finding the body of Holly Washa in the location given by Brown, King County detectives asked Palm Springs to continue questioning Brown about the Washington murder. No specifics were given about what questions should be asked, how the interview should be conducted, or the manner in which a record of the interview should be made. The Palm Springs Police then interviewed Brown for a second time. They gave King County Police the results of the second interview; at that point King County first became aware of the fact that the confession had been recorded. Following the third interview, Brown initiated a phone call to his Oregon parole officer, Larry Wibbenmeyer.

## B. FINDINGS OF FACT

1. The court looked at the totality of the circumstances surrounding this incident. Included in that evaluation was the time of the arrest and statements, the taking of the rape kit, the place of the confinement, and all other relevant material. The court relied upon extensive briefs by both parties.

2. The initial statements to Officer Glen Haas were in response to questioning. The questions were appropriate under the circumstances and were designed to obtain identifying data and information related to officer safety.

3. The court examined the available information on the defendant finding him intelligent, well read, and with experience in the criminal justice system. The interview transcript, tapes, and testimony of Detective Mark Harvey, establish that Brown was relaxed, coherent, attentive, articulate, and under no coercion whatsoever during each of the three interviews that occurred on May 27[,] 1991 and May 28, 1991.

4. The first two interviews, conducted 5/27/91 in Palm Springs, California, were at the request of Palm Springs Police. Detectives Harvey and Franz fully explained to the defendant his Miranda rights at the beginning of these two interviews. Brown understood his rights, and decided not to exercise them.

5. The third interview, conducted 5/28/91 in Palm Springs, California, was conducted at Brown's request. The defendant initiated contact with Detectives Harvey and Franz, so that he could give them more detail. The detectives again advised Brown of the Miranda rights and he again waived these rights.

6. When Brown asked about the death penalty in Washington, the detectives did not mislead him with their answers. Moreover, Brown understood that Washington state had a death penalty; the record shows that he did not misunderstand the situation he faced by murdering Holly Washa.

7. The defendant was unaware that Palm Springs Police taped his interviews with Detectives Harvey and Franz. Being unaware, he did not consent to the taping. However, the record shows that in the second interview (transcript p. 14), Brown asked questions about a tape and expressed no concerns about having the conversations recorded.

8. None of the Palm Springs Police who worked on the investigation in California were given any instructions from

Washington authorities about whether Brown's interviews should be recorded. Detective Earl Tripp of the King County Police did not find out the interviews were taped until after the third interview was finished.

9. Detective Tripp was not aware of Brown's confession in California until after the first interview on May 27, 1991. When Detective Tripp found out that Brown admitted he had killed Holly Washa, the detective conducted a follow-up investigation and located Ms. Washa's car. King County Police found Ms. Washa's body in the trunk of her own car, dead, slashed, beaten and bloody, on May 27, 1991.

10. Circumstances on May 27, 1991 prevented Detective Tripp from travelling to Palm Springs, California. Detective Tripp requested that Palm Springs Police continue their interview with Brown.

11. Officer Holtz of the Palm Springs Police Department monitored the tape in a separate room next to the interview room where Detectives Harvey and Franz were questioning Brown. There is no suggestion on the tapes or otherwise that parts of the interview are missing. It is the standard policy and practice of the Palm Springs Police Department to tape-record interviews with suspects in cases where the crime is a serious one.

12. The court finds that although Brown's statements to Officer Haas during the rape kit process have been ruled inadmissible, there is no connection between those statements and the confessions made later on May 27, 1991 and May 28, 1991.

C. CONCLUSIONS OF LAW

1. The initial statements made to Officer Haas are admissible during the State's case-in-chief. The questions were proper to obtain preliminary information and for officer safety considerations. The subsequent statements during the collections of physical evidence (suspect rape kit) are not admissible. The taking of the hair and other material could have been expected to elicit such statements. These statements are voluntary but may not be used during the State's case-in-chief since there was no Miranda warning given.

2. The statements made during the three interviews with Detectives Harvey and Franz were made after an intelligent, knowing and voluntary waiver of rights.

3. <u>State v. Gwinner</u>, 59 Wn. App. 119, 796 P.2d 728 (1990), is relied upon by the court. A request by a King County representative to continue the investigation is not sufficient to establish an agency relationship between the parties. An exchange of information does not transform the contact into an agency relationship.

4. RCW 9.73 is designed to protect Washington citizens in the state of Washington. The taping of the statements in California did not violate the law of that state. To suppress these statements would not further any interest of the state of Washington. A person who has fled the state cannot avail himself of the restrictive privacy rights afforded citizens present in the state.

5. California law allowed Detectives Harvey and Franz to conduct their interviews with the defendant while running a hidden tape recorded [sic]. The State's memorandum of California law, and [sic] the affidavit of Ronald Niver of the California Attorney General's Office, show that the Palm Springs Police acted in accordance with the statutory scheme in California.

6. The three statements of the defendant made on 27 and 28 May 1991 are admissible at trial during the State's case-in-chief. Brown made the statements voluntarily. Considering the totality of the circumstances, the State has met its burden of proving that Brown voluntarily confessed to murdering Holly Washa and to the other matters covered by his confession. The court also finds that the State met its burden of showing that Brown waived his <u>Miranda</u> rights knowingly, intelligently and voluntarily.[28]

. . . .

Petitioner was represented by Ms. Judith M. Mandel and Michael J. Trickey in his direct review before this court. Appellate counsel listed 38 assignments of error in the Brief of Appellant and an additional 20 assignments of error in

---

[28] Clerk's Papers at 4366-74. There is no explanation in the record for the nearly three-year delay in filing this certificate. We note the court reporter did not certify the verbatim report of proceedings until May 11, 1995.

the Supplemental Brief of Appellant.[29] On July 24, 1997, this court affirmed Appellant Brown's conviction and sentence.[30]

On March 5, 1999, Petitioner asked this court to appoint Dr. Roderick W. Pettis, M.D., a psychiatrist, to examine him and authorize compensation for Dr. Pettis' services.[31] On April 9, 1999, this court by order denied Petitioner's "Ex Parte Motion to Appoint Psychiatrist."[32] On April 30, 1999, Petitioner filed in this court this personal restraint petition in which he claimed ineffective assistance of counsel, newly discovered evidence, denial of due process and violations of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution on grounds of either vagueness or cruel and unusual punishment.

## DISCUSSION

### STANDARD OF REVIEW

Petitioner may not raise in a personal restraint petition an issue which "was raised and rejected on direct appeal unless the interests of justice require relitigation of that issue."[33] He may, however, raise *new* issues involving either errors of constitutional magnitude or nonconstitutional errors which constitute a fundamental defect and inherently result in a complete miscarriage of justice.[34] To obtain relief on new issues, Petitioner must establish "he was actually and substantially prejudiced by the error."[35] To obtain an evidentiary hearing, Petitioner "must demon-

---

[29] Br. of Appellant at 1-19.

[30] *State v. Brown*, 132 Wn.2d 529.

[31] Ex Parte Mot. to Appoint Psychiatrist (sealed).

[32] Order Den. Ex Parte Mot. to Appoint Psychiatrist (sealed).

[33] *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 303, 868 P.2d 835 (1994).

[34] *Id.*

[35] *Id.*

strate that he has competent, admissible evidence to establish facts which would entitle him to relief."[36]

### (1) INEFFECTIVE ASSISTANCE OF COUNSEL

*Whether Petitioner was deprived of effective assistance of counsel during the guilt and penalty phases of his trial and on direct appeal to this court.*

 Petitioner claims he was deprived of effective assistance of counsel during the guilt and penalty phases of his trial and on direct appeal to this court.[37] The constitutional right to counsel includes the right to effective assistance of counsel.[38] A criminal defendant bears the burden of establishing a violation of that right by showing both deficient performance and resulting prejudice.[39] Deficient performance is established by proof that defense counsel's representation "fell below an objective standard of reasonableness based on consideration of all the circumstances."[40] Prejudice is established where "there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different."[41] "Courts engage in a strong presumption counsel's representation was effective."[42] The actions of counsel about which a client complains do not amount to ineffective assistance if they go to the theory of the case or to trial tactics.[43]

---

[36] *Id.*

[37] Personal Restraint Pet. at 3-24, 46-70.

[38] *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), *adopted in State v. Jeffries*, 105 Wn.2d 398, 418, 717 P.2d 722 (1986).

[39] *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).

[40] *Id.*

[41] *Id.* at 335.

[42] *Id.*

[43] *State v. Garrett*, 124 Wn.2d 504, 520, 881 P.2d 185 (1994).

## Ineffective Assistance of Counsel During Guilt Phase

Petitioner claims he was denied effective assistance of counsel during the guilt phase of his trial. He was represented by Ms. Lin-Marie Hupp, Terry L. Mulligan and Kern W. Cleven.

Petitioner first claims that two items of evidence were available to establish an agency relationship between King County Police and Palm Springs Police, but that counsel did not present that evidence. The first item is a telephone log indicating frequency and duration of calls between King County Police and Palm Springs Police after Petitioner's first interview with Palm Springs Police.[44] The second item is an affidavit prepared by Palm Springs Detective Al Franz "for a search warrant specifically directed at gathering evidence related to the King County crime."[45] Existence of an agency relationship is relevant to the issue whether Petitioner's statements to Palm Springs Police in three interviews, which were recorded without his knowledge as permitted by California law, violated Washington's Privacy Act, chapter 9.73 RCW, and thus were inadmissible in Washington courts.[46]

Petitioner's first claim is without merit because he cannot establish deficient performance. The record does not include the actual telephone log and affidavit of Palm Springs Detective Franz. But counsel's performance did not fall below an objective standard of reasonableness because they did in fact call the trial court's attention to the telephone log and the affidavit in arguing an agency relationship between King County Police and Palm Springs Police. On September 10, 1992, defense counsel filed in the King County Superior Court a motion to suppress Petitioner's recorded statements to the Palm Springs Police. The motion provided in part:

---

[44] Personal Restraint Pet. at 7-8.

[45] *Id.* at 9.

[46] *State v. Brown*, 132 Wn.2d at 583-91.

The first interview ended at about 12:33 p.m. By that time, King County and Palm Springs [police] were in contact over the phone. King County officers found Holly Washa's car in the place Mr. Brown described, and eventually opened the trunk and found Ms. Washa's body inside. *King County and Palm Springs personnel spoke over the phone numerous times during the day.* Phone Records, King County and Palm Springs.

Before interviewing Mr. Brown, Detective Franz had prepared, but not presented to a judicial officer, a search warrant for the hotel room at the Ramada Inn. *After the first interview with Mr. Brown, he prepared a second search warrant specifically to search for items of evidentiary value to King County. . . .*

. . . .

## B PALM SPRINGS POLICE WERE ACTING AS AGENTS OF KING COUNTY, THUS THE "SILVER PLATTER" DOCTRINE DOES NOT APPLY

. . . .

. . . . In this case, however, the Palm Springs police considered themselves to be acting as agents of King County, as they in fact were. The Palm Springs police were investigating a Washington state crime and they knew it. *As soon as Mr. Brown started to reveal specifics regarding the Washington case, Detective Franz left the interview room to call King County. The second interview was conducted specifically at the request of King County. They went to the extent of preparing a second search warrant, dealing with the King County case, in order to seize evidence on the King County case from a scene they were already going to search as part of their case.* Palm Springs police do not usually conduct investigations for other agencies — this was the only time either of these detectives had ever been asked to do such a thing. They were acting specifically at the direction and as the agents of King County. . . .[47]

. . . .

Petitioner next claims the trial court erred in stating Finding of Fact 8 in the "Certificate Pursuant to CrR 3.5 of the Criminal Rules for Superior Court," and that his coun-

---

[47] Clerk's Papers at 521-22, 528 (emphasis added).

sel did not object to the error.[48] Finding of Fact 8 provided in part: "Detective Earl Tripp of the King County Police did not find out the interviews were taped *until after the third interview was finished.*"[49] However, under the section entitled "Facts of the Case," the trial court's certificate stated "The Palm Springs Police then interviewed Brown for a second time. *They gave King County Police the results of the second interview; at that point King County first became aware of the fact that the confession had been recorded.*"[50] Petitioner claims his counsel should have noted and objected to this factual inconsistency.

Even if his claim does constitute deficient performance by counsel, Petitioner cannot establish prejudice by showing there was a reasonable probability that, except for his asserted errors by counsel, the result of the proceeding would have been different. The trial court concluded that Petitioner's statements during the three interviews were "admissible at trial during the State's case-in-chief."[51] Petitioner does not challenge admissibility of statements made during the first interview.[52] Those statements and those in his second interview would have provided sufficient evidence—even without his statements in the third interview—for the jury to find him "guilty" of aggravated murder in the first degree and return a verdict finding there were not sufficient mitigating circumstances to merit leniency.

*Ineffective Assistance of Counsel During Penalty Phase*

Petitioner claims he was denied effective assistance of counsel during the penalty phase of his trial.[53] His trial counsel retained Dr. Roland Maiuro, a clinical psychologist,

---

[48] Personal Restraint Pet. at 6-7.

[49] Clerk's Papers at 4371 (emphasis added).

[50] *Id.* at 4369 (emphasis added).

[51] *Id.* at 4374.

[52] Reply Br. of Pet'r at 1 ("The initial taped confession made during an interview regarding the California crime is not in question.").

[53] Personal Restraint Pet. at 46-70.

who testified that records of lithium treatment while Petitioner was in prison in Oregon indicated the drug produced some progress in stabilizing his manic mood disorder, but concluded the State of Oregon did not adequately monitor Petitioner's continued use of lithium after he was paroled. Petitioner claims his counsel should also have retained a qualified psychiatrist and presented other expert testimony to corroborate Dr. Maiuro's testimony because a psychologist cannot legally prescribe medication such as lithium.

▮ Petitioner cannot under this claim establish either deficient performance by his counsel or resulting prejudice. In the presentation of manic mood disorder as mitigating evidence, the focus is on the disorder and not on its treatment with lithium. Petitioner apparently claims that because his own witness, Dr. Maiuro, could not legally prescribe medication, his credibility as an expert was somehow impaired. Dr. Maiuro was eminently qualified to render an opinion whether Petitioner suffered from a mental illness which would have excused his violent behavior, he being the director of the Anger Management and Domestic Violence Program at Harborview Medical Center/Mental Health Center and Associate Professor in the Department of Psychiatry and Behavioral Sciences at the University of Washington School of Medicine. Petitioner cannot establish how additional corroborating testimony would have changed the result of the penalty phase of his trial. "The [sentencing] jury doubtless discounted [Petitioner's] diagnosed personality disorders, since those disorders perhaps explained, but did not excuse, his violent behavior."[54]

Petitioner also claims he was denied effective assistance of counsel during the penalty phase because his counsel did not cross examine Dr. John R. Brinkley. He claims "Dr. Brinkley could have been impeached because he never interviewed the Petitioner, never interviewed Petitioner's family members, and never spoke with Sally Schick, who

---

[54] *State v. Brown*, 132 Wn.2d at 553.

was in a unique position to observe Petitioner's behavior and his response to lithium."[55]

 A decision not to cross examine a witness is often tactical because counsel may be concerned about opening the door to damaging rebuttal or because cross examination may not provide evidence useful to the defense.[56] In this case, the decision of Petitioner's counsel not to cross examine Dr. Brinkley conceivably was a tactical one which did not amount to ineffective assistance. Cross examination would not have provided evidence useful to the defense. During his direct examination, Dr. Brinkley testified he spent in excess of 12 hours reviewing Oregon prison records and Dr. Cripe's report to prepare for Petitioner's trial.[57] He apparently did not interview Petitioner, Petitioner's family members or Ms. Schick, nor was he under any obligation or requirement to do so. But, at any rate, that would not affect the quality of his testimony.

### Ineffective Assistance of Counsel on Direct Appeal

Petitioner claims he was denied effective assistance by appellate counsel.[58] He was represented by Ms. Judith M. Mandel and Michael J. Trickey on direct appeal to this court.

Petitioner claims the trial court erred in the penalty phase by admitting a record of his California convictions and that the error constituted an issue which appellate counsel should have raised on direct appeal, but did not. His convictions in California for his encounter with Ms. Susan J. Schnell were dated August 30, 1991. The "crime of which [Petitioner] has been found guilty," the killing of Ms. Holly C. Washa, occurred on May 24, 1991. The issue not raised on direct appeal was whether a sentencing jury could

---

[55] Personal Restraint Pet. at 61.

[56] *See In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 404, 972 P.2d 1250 (1999).

[57] Report of Proceedings (Dec. 21, 1993) at 90-91.

[58] Personal Restraint Pet. at 18-24.

consider his California convictions of August 30, 1991 as "prior criminal activity" under RCW 10.95.070(1) when the convictions occurred more than two months after the King County crime was committed on May 24, 1991 but prior to the penalty phase of his trial which began December 15, 1993 after his conviction on December 10, 1993.

 Petitioner's appellate counsel upon direct review made a total of 58 assignments of error which did not include an assignment of error to the trial court's admission of Petitioner's California convictions of August 30, 1991. "Failure to raise all possible nonfrivolous issues on appeal is not ineffective assistance [of counsel] . . . ."[59] "[I]n order to prevail on the appellate ineffectiveness claim, [Petitioner] must show the merit of the underlying legal issues his appellate counsel failed to raise or raised improperly and then demonstrate actual prejudice."[60]

 Petitioner cannot establish the merit of the underlying legal issue he claims his appellate counsel did not raise. He claims a sentencing jury cannot consider his California convictions of August 30, 1991 as "prior criminal activity" under RCW 10.95.070(1) because those convictions occurred after the crime for which he was convicted in King County was committed on May 24, 1991. Nothing in RCW 10.95.070(1) indicates a sentencing jury may only consider convictions occurring prior to the date of the crime for which a defendant is being tried. It is sufficient that the prior conviction be established prior to conclusion of the case before the court.[61]

In this case, Petitioner was convicted of aggravated first degree murder on December 10, 1993. Under *State v. Gentry* and the plain language of RCW 10.95.070(1), his California convictions of August 30, 1991 could appropriately be considered by the jury during the penalty phase of his trial which began December 15, 1993.

---

[59] *In re Pers. Restraint of Lord*, 123 Wn.2d at 314.

[60] *Id.*

[61] *See State v. Gentry*, 125 Wn.2d 570, 641, 888 P.2d 1105 (1995).

## (2) NEWLY DISCOVERED EVIDENCE

*Whether there is newly discovered evidence which entitles Petitioner to a new capital sentencing hearing.*

▪ Petitioner claims newly discovered evidence entitles him to a new capital sentencing hearing.[62] Under RAP 16.4, an "appellate court will grant appropriate relief to a petitioner" if "[m]aterial facts exist which have not been previously presented and heard, which in the interest of justice require vacation of the conviction, sentence, or other order entered in a criminal proceeding." The standard applied under RAP 16.4(c)(3) for a new sentencing proceeding is the same as that applied to a motion for new trial based upon newly discovered evidence.[63] Petitioner must establish "that the evidence (1) will probably change the result of the trial; (2) was discovered since the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; *and* (5) is not merely cumulative or impeaching. The absence of any one of the five factors is grounds for the denial of a new" proceeding.[64]

One item of "newly discovered evidence" claimed by Petitioner is his medical records from the Washington State Penitentiary indicating he is benefiting from lithium treatment.[65] Petitioner claimed as a mitigating circumstance during the penalty phase that he suffered from a mood disorder which would have benefited from lithium treatment.[66] On rebuttal for the State, Dr. John R. Brinkley testified that he had no clear indication from the records he reviewed that Petitioner "had a disorder for which lithium was appropriate." Petitioner claims Dr. Brinkley's testimony conflicts with "newly discovered evidence" contained

---

[62] Personal Restraint Pet. at 70-77.

[63] *In re Pers. Restraint of Lord*, 123 Wn.2d at 319-20 (citing *State v. Williams*, 96 Wn.2d 215, 223, 634 P.2d 868 (1981)).

[64] *State v. Williams*, 96 Wn.2d at 222-23 (citations omitted).

[65] Personal Restraint Pet. at 71.

[66] Report of Proceedings (Dec. 17, 1993) at 58 (testimony of Dr. Roland D. Maiuro, Ph.D.).

in his medical records from the Washington State Penitentiary and that he is thus entitled to a new sentencing proceeding.[67]

■ Petitioner's claim is without merit. His medical records from the Washington State Penitentiary constitute cumulative evidence, which under *State v. Williams* does not constitute a sufficient basis for a new trial. "Cumulative evidence is additional evidence of the same kind to the same point."[68] During the penalty phase, Petitioner offered testimony by Dr. Maiuro that Petitioner would have benefited from lithium treatment.

Petitioner also claims as "newly discovered evidence" the statement by Dr. Brinkley in a letter to the Prosecuting Attorney that he derived "satisfaction from contributing to the outcome of this case, and would be delighted to work with [the Prosecuting Attorney] in the future should the opportunity arise." Petitioner claims this statement is "evidence" of bias against him and in favor of the death penalty.[69] This claim is without merit. Dr. Brinkley's statement was made in his letter to the King County Prosecuting Attorney asking payment for his psychiatric expert services. The brief statement merely constitutes business courtesy language and does not rise to the status of evidence of bias. Petitioner cannot establish that Dr. Brinkley's statement constituted the basis for a new trial under the criteria announced in *State v. Williams*.[70]

### (3) Constitutional Due Process

*Whether this court's denial of funding for a psychiatrist during postconviction proceedings and the trial court's limited funds for experts deprived Petitioner of due process guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution.*

---

[67] Personal Restraint Pet. at 74.

[68] *State v. Williams*, 96 Wn.2d at 223-24.

[69] Personal Restraint Pet. at 74-77.

[70] *State v. Williams*, 96 Wn.2d at 223-24.

 An indigent defendant in a criminal proceeding is entitled to the due process guaranty of fundamental fairness under the Fourteenth Amendment.[71] A "criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that [the defendant] has access to the raw materials integral to the building of an effective defense."[72] While the State is not required to "purchase for the indigent defendant all the assistance that [the defendant's] wealthier counterpart might buy," it must provide for that defendant the "basic tools of an adequate defense or appeal."[73]

Petitioner claims he was denied due process because the trial court did not "appropriate the funds necessary to prepare an adequate defense."[74] This claim is without merit. The record indicates the trial court authorized funding for four experts to assist him in preparing mitigating evidence. The trial court authorized in excess of $24,570.00 for experts to assist Petitioner in preparing an adequate defense during the penalty phase.

 Petitioner also claims he was denied due process because on April 9, 1999, this court denied his request for appointment of a psychiatrist during postconviction proceedings.[75] He claims a competent psychiatrist would have helped establish his postconviction claim of ineffective assistance of counsel and determine whether he suffers from a mental disorder which would benefit from lithium treatment.[76]

In *In re Personal Restraint of Gentry*, this court stated:

> There are few published decisions involving requests for appointment of investigators or experts in connection with

---

[71] *Ake v. Oklahoma*, 470 U.S. 68, 76, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985).

[72] *Id.* at 77.

[73] *Id.*

[74] Personal Restraint Pet. at 77-82.

[75] *Id.* at 86-88.

[76] *Id.* at 86.

postconviction proceedings. . . . But none of these cases authorize . . . the appointment of investigators or experts to identify or develop grounds for challenging convictions or sentences. They merely allow the defendant to interview known witnesses or to obtain or test existing evidence in the government's possession. They also require a showing there is reason to believe a specific discovery request will support a particular, identified claim for relief.[77]

In this case, there is not a sufficient basis for expecting Petitioner's request for appointment of a psychiatrist to support a claim for relief. His claim of ineffective assistance of counsel during the penalty phase based upon the postconviction appointment of a psychiatrist issue is without merit because Petitioner already had benefit of the services of a qualified psychologist to establish a mental disorder which would benefit from lithium treatment. While "the assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense, . . . [p]sychiatry is not, however, an exact science."[78] "[P]sychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, on cure and treatment, and on likelihood of future dangerousness."[79] At best the testimony of the psychiatrist would have served only to corroborate the testimony of Dr. Maiuro, the psychologist who testified for Petitioner in the penalty phase.

### (4) VOID FOR VAGUENESS

*Whether RCW 10.95.070(1) violates the Eighth and Fourteenth Amendments to the United States Constitution because the word "relevant" in the statute is vague when interpreted in the context of Petitioner's "prior criminal activity."*

---

[77] 137 Wn.2d at 392.

[78] *Ake v. Oklahoma*, 470 U.S. at 80-81.

[79] *Id.* at 81.

Petitioner claims RCW 10.95.070(1) violates the Eighth and Fourteenth Amendments to the United States Constitution because the word "relevant" in the statute is vague when interpreted in the context of Petitioner's "prior criminal activity." RCW 10.95.070 provides:

**Special sentencing proceeding—Factors which jury may consider in deciding whether leniency merited.** In deciding the question posed by RCW 10.95.060(4), the jury, or the court if a jury is waived, may consider any relevant factors, including but not limited to the following:

(1) Whether the defendant has or does not have a significant history, either as a juvenile or an adult, of prior criminal activity;

(2) Whether the murder was committed while the defendant was under the influence of extreme mental disturbance;

(3) Whether the victim consented to the act of murder;

(4) Whether the defendant was an accomplice to a murder committed by another person where the defendant's participation in the murder was relatively minor;

(5) Whether the defendant acted under duress or domination of another person;

(6) Whether, at the time of the murder, the capacity of the defendant to appreciate the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired as a result of mental disease or defect. However, a person found to be mentally retarded under RCW 10.95.030(2) may in no case be sentenced to death;

(7) Whether the age of the defendant at the time of the crime calls for leniency; and

(8) Whether there is a likelihood that the defendant will pose a danger to others in the future.

In *State v. Bartholomew* I, this court limited "prior criminal activity" to a defendant's record of convictions.[80] In *State v. Bartholomew* II, this court stated:

---

[80] *State v. Bartholomew*, 98 Wn.2d 173, 196-97, 654 P.2d 1170 (1982), *vacated on other grounds*, 463 U.S. 1203, 103 S. Ct. 3530, 77 L. Ed. 2d 1383 (1983).

[T]he remaining provisions in RCW 10.95.060 and the provisions of RCW 10.95.070 must be construed subject to the rules of evidence and the state and federal constitutional strictures we have identified in this opinion. Specifically, the liberal authority provided by RCW 10.95.060(3) to receive "any relevant evidence" must be limited to mitigating evidence only. *Similarly, the jury's liberal mandate under RCW 10.95.070 to consider "any relevant factors" shall be limited to mitigating factors only.* The admission of evidence of aggravating factors and consideration by the jury of aggravating factors must be restricted to meet the evidentiary, and state and federal constitutional standards we have articulated. Specifically, evidence of nonstatutory aggravating factors must be limited to defendant's criminal record, evidence that would have been admissible at the guilt phase, and evidence to rebut matters raised in mitigation by the defendant. This rebuttal evidence must meet the following balancing test found in our prior decision:

> In our opinion, the prosecution should be entitled to produce information necessary to rebut mitigating evidence produced by defendant. Defendant's right to present mitigating evidence is limited only by the requirement of relevance. . . .
>
> This holding will require the trial court to evaluate the rebuttal evidence offered by the prosecution. Rebuttal evidence should be admitted only if it is relevant to a matter raised in mitigation by defendant. Evidence might be relevant, for instance, if it casts doubt upon the reliability of defendant's mitigating evidence. We do not intend, however, that the prosecution be permitted to produce any evidence it cares to so long as it points to some element of rebuttal no matter how slight or incidental. The court in determining whether to admit the prosecution's evidence should apply a balancing test similar to that contemplated by ER 403. The court must balance the extent to which the evidence tends to rebut defendant's mitigating information against the extent to which the evidence is otherwise prejudicial to defendant. Only if the rebuttal value of the evidence outweighs the prejudicial effect should the evidence be admitted.[81]

Petitioner claims that despite the language of RCW

---

[81] *State v. Bartholomew*, 101 Wn.2d 631, 642-43, 683 P.2d 1079 (1984) (emphasis added) (quoting *Bartholomew* I, 98 Wn.2d at 197-98).

10.95.070, *Bartholomew* I and *Bartholomew* II, the statutory provision is still vague. In support of his claim, he cites the contentions of trial counsel concerning Petitioner's motion to exclude all evidence of criminal history during the penalty phase.[82] Counsel for the State contended it could offer evidence of prior convictions at any time during the penalty phase to meet its burden of proof in overcoming the presumption of leniency in favor of Petitioner.[83] Petitioner's counsel contended that under *Bartholomew* II, "provisions of RCW 10.95.070 are limited to mitigating factors" and that the State could offer evidence of prior convictions in rebuttal only if Petitioner first offered such evidence as a mitigating factor.[84]

Petitioner misconstrues *Bartholomew* II. RCW 10.95-.070(1) is not unconstitutionally vague. It lists eight factors for a sentencing jury to consider in deciding whether leniency is merited. This list, however, is not exclusive because of the statutory language "including but not limited to." Although this court in *Bartholomew* II stated "the jury's liberal mandate under RCW 10.95.070 to consider 'any relevant factors' shall be limited to mitigating factors only," that statement applies to admissibility of *unenumerated factors* and not to *enumerated factors* such as prior convictions. "[E]*vidence of nonstatutory aggravating factors must be limited to defendant's criminal record,* evidence that would have been admissible at the guilt phase, *and evidence to rebut matters raised in mitigation by the defendant.*"[85]

In this case, the State offered evidence of Petitioner's prior convictions after its opening statement but before Petitioner offered evidence of mitigating factors. This was permissible under *Bartholomew* II and RCW 10.95.070(1).

---

[82] *See* Report of Proceedings (Dec. 14, 1993) at 3.

[83] *Id.* at 30-33.

[84] *Id.* at 26-27.

[85] *State v. Bartholomew,* 101 Wn.2d at 642 (emphasis added).

## (5) CRUEL AND UNUSUAL PUNISHMENT

*Whether Petitioner's sentence of death was imposed arbitrarily because of budgetary constraints in violation of the "cruel and unusual punishment" clause of the Eighth Amendment to the United States Constitution.*

Petitioner claims the "death penalty as administered in King County[,] Washington is cruel and unusual punishment because it is uniquely inflicted on the poor."[86] He claims that "budgetary constraints prevented Petitioner's counsel from retaining qualified experts and the services necessary for the presentation of a minimally adequate defense."[87]

The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." It applies to the states through the Fourteenth Amendment.[88] Under the Eighth Amendment, the "sentencing scheme must not allow the death penalty to be wantonly or freakishly imposed, it must direct and limit jury discretion, to minimize the risk of arbitrary or capricious action, and it must allow particularized consideration of relevant aspects of the character and record of each defendant, and the circumstances of the offense, before imposition of the sentence."[89]

The record does not support Petitioner's claim of cruel and unusual punishment. Imposition of the death penalty in this case was not arbitrary because of "budgetary constraints" nor for any other reason. During the penalty phase of his trial, Petitioner was provided at State expense three attorneys to assist in his defense. He had the services

---

[86] Personal Restraint Pet. at 82-86.

[87] *Id.* at 85-86.

[88] *State v. Dodd*, 120 Wn.2d 1, 13 n.2, 838 P.2d 86 (1992) (citing *Robinson v. California*, 370 U.S. 660, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1962)).

[89] *Id.* at 13-14 n.2 (citing *Gregg v. Georgia*, 428 U.S. 153, 188-89, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 304-05, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976)).

of four experts and authorized funds in excess of $24,570.00 for experts in preparation of his defense against imposition of the death penalty.

## SUMMARY AND CONCLUSIONS

A criminal defendant bears the burden of establishing a claim of ineffective assistance of counsel by showing both deficient performance and resulting prejudice. Performance is not deficient merely because counsel does not present the trial court with actual evidence to support a claim. Counsel need only make an accurate representation of such evidence and bring it to the attention of the court. A defendant is not prejudiced by counsel's performance if counsel does not object to inconsequential inconsistencies found in a court's written findings of fact and conclusions of law under CrR 3.5. The factual inconsistencies in this case would have served only to suppress statements recorded in a third interview and not those in the crucial first and second interviews of Petitioner by California Police. Performance is also not deficient if counsel did not retain a psychiatrist or call other expert witnesses to corroborate the testimony of a psychologist who testified for Petitioner. The psychologist was qualified to render an opinion whether Petitioner suffered from mental illness. Counsel's decision not to cross examine a witness in the penalty phase constitutes a tactical decision not amounting to ineffective assistance unless it could be established that cross examination would have provided evidence useful to the defense.

Appellate counsel's performance is not deficient simply because all possible nonfrivolous issues were not raised on direct appeal. In order to prevail on a claim of ineffective appellate counsel, Petitioner must show the merit of the underlying legal issue which was not raised and then demonstrate actual prejudice. Petitioner has not established his claim under RCW 10.95.070(1) and *State v. Gentry*.

A sentencing jury is not limited to considering only those

convictions which existed prior to the date of the crime for which a defendant is being tried. It is sufficient if the prior conviction occurred before the sentencing procedure has been completed.

Newly discovered evidence would entitle Petitioner to a new sentencing proceeding if the evidence (1) would probably change the result of the trial; (2) was discovered since the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; and (5) is not merely cumulative or impeaching. The absence of any one of these five factors is sufficient for denial of a new sentencing proceeding. Petitioner has not offered newly discovered evidence which entitles him to a new proceeding simply by offering his medical records from the Washington State Penitentiary to corroborate the testimony of defense witness Dr. Maiuro, a psychologist, concerning the effect of lithium in treating Petitioner. Petitioner also has not established newly discovered evidence of bias merely from words of courtesy in a letter from a State witness, a psychiatrist, to the Prosecuting Attorney requesting payment for his services.

An indigent defendant in a criminal proceeding is entitled to the due process guaranty of fundamental fairness under the Fourteenth Amendment. Fundamental fairness requires a State to provide the "basic tools of an adequate defense or appeal." However, the State need not "purchase for the indigent defendant all the assistance that his wealthier counterpart might buy." In this case, Petitioner was not denied due process. The trial court authorized in excess of $24,570.00 for the services of four experts to assist Petitioner in preparing mitigating evidence. Petitioner also was not denied due process when this court denied his request for appointment of a psychiatrist during postconviction proceedings.

Under the Eighth Amendment to the United States Constitution, a sentencing scheme can neither be vague nor inflict cruel and unusual punishment. This Court's interpretation of RCW 10.95.070(1) in *Bartholomew* I and II

concludes the statute is not unconstitutionally vague. Factors which are not enumerated by RCW 10.95.070 are relevant if they are limited to mitigating factors. Factors which are enumerated by RCW 10.95.070, such as prior convictions, may be presented by the State as nonstatutory aggravating factors at any time during the penalty phase for consideration by a sentencing jury. Petitioner's claim of budgetary constraints does not support a finding of cruel and unusual punishment inasmuch as he was provided at State expense the services of three attorneys and four experts and an authorized budget in excess of $24,570.00 for the experts to assist in preparation of his defense against imposition of the death penalty.

We deny the personal restraint petition of Petitioner Cal Coburn Brown in which he claims ineffective assistance of counsel, newly discovered evidence, denial of due process under the Sixth and Fourteenth Amendments to the United States Constitution, and violations of the Eighth and Fourteenth Amendments to the United States Constitution on grounds of either vagueness or cruel and unusual punishment. His conviction in the King County Superior Court of aggravated murder in the first degree and imposition of the death penalty stands.

ALEXANDER, C.J., JOHNSON, IRELAND, and BRIDGE, JJ., and GUY and TALMADGE, JJ. Pro Tem., concur.

ALEXANDER, C.J. (concurring) — I fully agree with the majority that we should deny Cal C. Brown's personal restraint petition. I write separately because I feel compelled to respond to the dissent's contention that Brown was unduly prejudiced during the penalty phase of the trial by the trial court's admission of evidence of Brown's convictions in California for various crimes that occurred after the murder that led to the imposition of the death penalty here, but prior to the trial for that murder. Although Brown's counsel objected at trial to the introduction of this evidence, the issue was not raised on direct appeal. The dissent

concludes, therefore, that his appellate counsel's failure to seek reversal of the conviction on that basis constituted ineffective counsel and grounds for relief.

When evaluating a claim of ineffective counsel we require a showing that (1) counsel was deficient; and (2) there is a reasonable probability that but for the deficiency the outcome of the proceeding would be different. *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). The petitioner bears the burden of proof on both. As indicated by the majority, however, a claim of ineffective counsel fails when there is no merit to the underlying legal issue appellate counsel failed to raise on appeal.

Even, if we assume, as the dissent asserts, that Brown's counsel was deficient in failing "to fight for its suppression on appeal," it does not follow that the petition should be granted. Dissent at 465. In my view, the admission of evidence during the penalty phase of the trial regarding the fact of the California convictions could not have had any significant influence on the jury's decision to impose the penalty of death. I say that because evidence regarding the circumstances that led to Brown's California convictions was introduced during the guilt phase of the trial.[90] Thus, it is a stretch to say that Brown was prejudiced during the penalty phase of the trial by the introduction of evidence that he was convicted of crimes that had already been described to the jury in great detail.

Accordingly, I concur.

MADSEN, J., concurs with ALEXANDER, C.J.

SANDERS, J. (dissenting) — Without doubt the most damning evidence admitted against Cal Brown in the penalty phase was his conviction for slitting a woman's throat in California immediately after murdering his Washington

---

[90] Although I signed the dissenting opinion in *State v. Brown*, 132 Wn.2d 529, 940 P.2d 546 (1997), agreeing with the writer of that opinion that testimony of the California convictions should not have been admitted into evidence, the majority concluded otherwise and that is now the law of the case.

victim. If this evidence were even arguably inadmissible, his appellate counsel's failure to fight for its suppression on appeal was inexplicable.

One's constitutional right to the effective assistance of counsel is violated when it is shown (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

During the death phase of Brown's trial the trial court, over objection, permitted evidence of convictions for offenses committed *after* the Washington murder to be presented under a statute which allows evidence of only *prior* criminal activity. There can be no question this evidence was extremely prejudicial to a man seeking mercy from a jury of his peers. Nor is it surprising the jury sentenced Brown to death in light of this evidence. Therefore the failure of Brown's appellate counsel to assign error on appeal to this ruling raises the specter of ineffective assistance of appellate counsel which cannot easily be dispelled.

The admissibility of this evidence turns on a question of statutory construction which we must review de novo. *Health Ins. Pool v. Health Care Auth.*, 129 Wn.2d 504, 507, 919 P.2d 62 (1996).

RCW 10.95.070 mandates what may and may not be considered in the penalty phase of a capital trial. That statute provides the jury

> may consider any relevant factors, including but not limited to the following:
>
> (1) Whether the defendant has or does not have a significant history, either as a juvenile or an adult, of *prior criminal activity*;
>
> . . . .

RCW 10.95.070 (emphasis added). Although the statute does not state, in so many words, that "prior" criminal activity is that activity which occurred prior to the crime in

question, I posit no other view makes sense. Simply put, if the legislature intended to allow evidence of *any* convictions returned through the time of trial it would not have said "prior" convictions, it would have said "any" convictions, or perhaps would have said nothing at all. Further I posit the majority's reading renders the term "prior" mere surplusage since by the majority's understanding *every* offense would be by necessity "prior" to the trial, denuding the term of all practical consequence or purpose.

Drafters of legislation " 'are presumed to have used no superfluous words and we must accord meaning, if possible, to every word in a statute . . . .' " *In re Recall of Pearsall-Stipek*, 141 Wn.2d 756, 767, 10 P.3d 1034 (2000) (quoting *Greenwood v. Dep't of Motor Vehicles*, 13 Wn. App. 624, 628, 536 P.2d 644 (1975)); *cf. City of Bellevue v. Lorang*, 140 Wn.2d 19, 25, 992 P.2d 496 (2000) (court will not construe statute to render term superfluous).

The majority glosses over this issue by saying it is sufficient that the "prior conviction" be established "prior to conclusion of the case before the court," majority at 452, apparently assuming the legislature specified "prior" convictions so as not to allow proof of convictions which occurred *after* "conclusion of the case before the court." *Id*. But posttrial convictions by their nature cannot exist until after the trial.

The rules of statutory construction require we avoid interpretations which yield absurd results or fail to give effect to the legislative intent. *State v. Azpitarte*, 140 Wn.2d 138, 141-42, 995 P.2d 31 (2000). If admission into evidence of *all* convictions were the meaning intended by the legislature it could have completely omitted the term "prior" without changing the nature of admissible evidence in any imaginable proceeding under the majority's rule. "Prior" would mean nothing.

The majority justifies its reach by referring the reader to *State v. Gentry*, 125 Wn.2d 570, 641, 888 P.2d 1105 (1995). Majority at 452. Such reliance is also misplaced. In *Gentry* we considered only whether the prosecutor could reason-

ably draw inferences from facts in evidence. *Gentry*, 125 Wn.2d at 641. Although a postcommission offense was admitted into evidence in the sentencing phase, the propriety of its admission under RCW 10.95.070 was neither challenged nor discussed. If resolution of an issue not necessary to reach the result is nonbinding dicta, *In re Estate of Levas*, 33 Wn.2d 530, 534, 206 P.2d 482 (1949), extrapolation of prior *silence* on an issue not even before the court must be even less.

Although I reject that there can be *two* reasonable meanings fairly attributable to this aspect of the statute, a statute is said to be ambiguous if it can be reasonably interpreted in two or more different ways. *In re Post Sentence Review of Charles*, 135 Wn.2d 239, 250, 955 P.2d 798 (1998). However even if we were to grant that this statute is ambiguous, the result would be no different because the rule of lenity requires criminal statutes to be strictly construed against the state, resolving all ambiguities in favor of the accused. *State v. Bell*, 8 Wn. App. 670, 674, 508 P.2d 1398, *aff'd*, 83 Wn.2d 383, 518 P.2d 696 (1973).

But the majority stands the lenity rule on its head, opining "[n]othing in RCW 10.95.070(1) indicates a sentencing jury may only consider convictions occurring prior to the date of the crime for which a defendant is being tried." Majority at 452. *Au contraire*, a proper application of the rule of lenity requires the court to observe that if nothing in the statute *expressly allows* subsequent offenses to be considered as prior convictions they may not be. *State v. McGee*, 122 Wn.2d 783, 787, 864 P.2d 912 (1993). By the majority's reasoning, however, this court's previous silence on an issue not raised and the legislature's silence on the meaning of an alleged ambiguous term apparently combine to justify an untenable result in the most serious of all criminal proceedings—one upon which a man's life depends.

We need not decide whether counsel's unexplained failure to raise this issue on appeal " 'more likely than not altered the outcome in the case' " to justify reversal, al-

though I posit it did. *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987) (quoting *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984)). Rather, we must determine whether there is a probability " '*sufficient to undermine confidence in the outcome*' " that, " 'but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694).

Notwithstanding the jury already heard testimony related to the subsequent convictions in the guilt phase, readmission of such evidence in the sentencing phase wrongly invited the jury to consider evidence of the subsequent criminal conduct as a *lawful basis* to impose the death penalty. The trial court failed to appreciate the differing standards and reasons for admission between the two phases of the trial, saying "if the jury had not heard about what happened in Palm Springs, California, this decision might very well be different." State's Resp. to Personal Restraint Pet. (quoting 41 Report of Proceedings at 38-41). While the evidence was arguably admissible in the guilt phase as res gestae,[91] no such basis existed in the penalty phase—which is governed solely by RCW 10.95.070. Rather than following the controlling statute and applying its plain language, the trial court improperly admitted the evidence in the penalty phase simply because it had already been admitted for other (inapplicable) reasons in the guilt phase.

As Brown was entitled to a presumption of leniency at his capital sentencing proceeding, *see State v. Brett*, 126 Wn.2d 136, 191, 892 P.2d 29 (1995) (*citing* RCW 10.95.060(4)), there is certainly at least a reasonable probability that the erroneous introduction of this highly prejudicial evidence overcame that presumption in the mind of at least one juror. This would have been determinative since absent

---

[91] The admissibility of the subsequent offense evidence under the res gestae exception was problematic in Brown's original appeal. *See State v. Brown*, 132 Wn.2d 529, 634-35, 940 P.2d 546 (1997) (Madsen, J., concurring in part, dissenting in part).

›

absolute unanimity Brown would not have received the death sentence. The issue was ripe for appeal, failure to raise it was unreasonable, and the error was prejudicial.

Prior means prior.

I dissent.

Reconsideration denied June 13, 2001.