**NOTICE: SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

Filed
Washington State
Court of Appeals
Division Two

March 15, 2022

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint of<br><br>LEON LEE REYES,<br><br>                    Petitioner. | No. 52449-0-II<br><br><br>PUBLISHED OPINION |

GLASGOW, A.C.J—Leon Lee Reyes was convicted of homicide by abuse of his toddler stepson, Hayden[1] Kostelecky, in 2007. In 2018, Reyes filed a personal restraint petition (PRP) containing two declarations that he argued constituted new evidence undermining the State's theory that Reyes caused Hayden's death by shaking him. This court remanded for a reference hearing to determine if there has been a paradigm shift in the medical community's understanding of shaken baby syndrome or abusive head trauma[2] symptoms or diagnoses since 2007, and whether such evidence would have been available to Reyes at his trial.

The trial court found that no shift occurred in the medical community's understanding or acceptance of abusive head trauma. Reyes argues that substantial evidence does not support the reference hearing findings and that we should judicially estop the State from asserting the position it took at the reference hearing. He seeks a new trial or resentencing or, in the alternative, leave to

---

[1] We use the spelling provided by Hayden's mother rather than the one provided by Reyes, his stepfather.

[2] Although "shaken baby syndrome" is still a widely-used term and recognized diagnosis, the more modern term "abusive head trauma" appeared in the mid-2000s, recognizing that the relevant symptoms can appear in children who are out of infancy and that the symptoms can appear from shaking combined with an impact.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 52449-0-II

amend his PRP to add claims for ineffective assistance of counsel, false testimony, and violation of his right to control his defense. Reyes also asks this court to strike Dr. Elizabeth Woods's declaration, which the State provided in response to Reyes's PRP before the reference hearing, and order sanctions against the State.

We affirm the reference hearing findings and dismiss the PRP as untimely because Reyes fails to establish that his PRP qualifies for the newly discovered evidence exception to the statutory time bar or that his PRP is otherwise timely. We deny the request to strike Dr. Woods's declaration and the request for sanctions.

FACTS

I. BACKGROUND

Reyes began dating Laura Kostelecky[3] in late 2004, and the two moved in together several months later and eventually married. When the couple started dating, Laura had a one-year-old son, Hayden. Reyes had two sons, TR and PR, who were approximately two and five years old. The three boys frequently played on and around a bunk bed.

One night in February 2006, while Laura was at work, Hayden collapsed and became unresponsive. Reyes told police that he had been washing dishes when he heard the three boys "fighting and carrying on," and that Hayden came out of the bedroom complaining that his head hurt. Verbatim Report of Proceedings (VRP) (Jan. 29, 2007) at 202. Reyes said he had been annoyed by the noise of the fighting and picked up Hayden by the waist, holding him so tight that

---

[3] Because the two married, Laura's last name was Reyes at the time of trial. To avoid confusion, we refer to her by her first name.

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 52449-0-II

Reyes's fingers almost touched, and Hayden had muscle spasms and "went stiff." *Id.* at 203.[4] Reyes reported that he splashed cold water on Hayden's face trying to revive him, bumping Hayden's head on the sink in the process. Reyes called 911 and Hayden was taken to Mary Bridge Children's Hospital.

At the hospital, a CT scan showed two subdural hematomas (bleeding under the dura, a membrane that surrounds the brain)—one very fresh and one slightly older. Dr. Peter Brown attempted to relieve the pressure from the subdural hematoma and cerebral edema (brain swelling) with surgery.

Hayden's condition did not improve, and he was declared brain dead the next morning and taken off life support. The State charged Reyes with homicide by abuse and second degree murder.

## II. TRIAL

At trial, the State argued that Hayden was the victim of ongoing abuse for months before his death based on his history of injuries, as well as the multiple injuries of varying ages discovered when Hayden was treated at the hospital. Reyes's trial counsel countered with the theory that Hayden could have sustained his injuries from falling off the five-foot-high bunk bed or from being jumped on by his stepbrothers. Defense counsel also sought to undermine the State's theory regarding the pattern of abuse, which was an element of the homicide by abuse charge. *See* RCW 9A.32.055(1) (requiring "a pattern or practice of assault or torture").

---

[4] It is unclear from this testimony whether Reyes reported that he picked up Hayden before or after Hayden lost consciousness.

No. 52449-0-II

A.      Injuries That Caused Hayden's Death

The State presented evidence of injuries that doctors observed during Hayden's surgery and autopsy. Dr. John Paschall, who assisted with Hayden's treatment and surgery, testified that Hayden arrived at the hospital with two subdural hematomas and cerebral edema that was "one of the worst [cases] that [he had] seen in nearly 20 years of practice," but Hayden had no skull fracture. VRP (Jan. 29, 2007) at 185. The State also called Dr. Robert Ramoso, who performed Hayden's autopsy. The autopsy found substantial retinal hemorrhaging in both eyes. Dr. Ramoso concluded that blunt head trauma, which could have been shaking, a blow to the head, or both, caused Hayden's death. Dr. Ramoso acknowledged on cross-examination that there was controversy in the diagnosis of blunt head trauma injury versus shaking.

The State presented testimony to establish the cause of Hayden's injuries. Dr. Paschall testified that retinal hemorrhaging is "felt to be pathognomonic or diagnostic for the finding of non-accidental trauma." *Id.* at 165. Dr. Ramoso testified that the cause of subdural hematoma is not certain, but "[a] lot of people think it's because of the shearing effect when the head [is] traumatized" from shaking. *Id.* at 281. Dr. Yolanda Duralde, the medical director at Mary Bridge's Child Abuse Intervention Department, testified that subdural hematomas with no skull fracture pointed toward a shaking-type injury. Dr. Duralde acknowledged that skull fractures can result from falls of less than four feet.

During defense counsel's cross-examination of Dr. Duralde, she said that blunt force injury can produce retinal hemorrhaging, although "[r]etinal hemorrhaging, bilaterally, has not been seen in any cases of accidental blunt force trauma." *Id.* at 258. "[Y]our suspicion for some sort of shaking involved in this goes up tremendously because, you know, of the hundreds to thousands

4

No. 52449-0-II

of cases that have been reviewed of head trauma in children, there have never been bilateral retinal hemorrhages in any kind of accidental blunt force trauma." *Id.* at 259. Dr. Duralde conceded that both of Hayden's subdural hematomas could have been the result of a single incident, although the newer bleed was clearly fresh and the older bleed could have occurred several hours or days earlier.

The State called Reyes's oldest son, TR, who was eight at the time of the trial. After a competency hearing, TR testified. His testimony about the day Hayden was injured was inconsistent, sometimes stating that Hayden fell from the bunk bed, and sometimes stating that the fall occurred on a different day. The State also called Debra Vause, a police officer who interviewed TR the night of Hayden's collapse. TR told Vause that night that he did not see what happened to Hayden.

B.       Hayden's Contemporaneous and Prior Injuries

Dr. Ramoso testified that in addition to subdural hematoma and cerebral edema, the autopsy found that Hayden had bruising on his forehead from several days before hospitalization and a fresh bruise in the deep tissue of his scalp on top of his head. Hayden also had bruises on his torso and a recently broken rib. There was bruising on Hayden's thighs that family members testified resembled belt marks. Hayden also had lacerations on his spleen, stomach, intestines, colon, liver, and pancreas that were healing and predated his hospitalization by several days.

Dr. Duralde testified that rib fractures are known to accompany abusive head injuries from shaking. Dr. Duralde and Dr. Ramoso testified that the blows causing the bruises on Hayden's forehead and the top of his head could not have caused his severe brain injuries.

To support its theory of homicide by abuse, which required the State to show a pattern of abusive conduct, the State presented evidence that Hayden sustained a series of injuries after Reyes

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 52449-0-II

entered his life. In April 2005, Hayden's ankle was injured while Reyes was carrying him in a parking lot. There was inconsistent testimony about whether Laura was present when the ankle injury occurred. In contrast, Reyes told Hayden's day care that the injury occurred from falling off a bunk bed.

In June 2005, Hayden sustained a fractured elbow, which resulted in the day care contacting Child Protective Services. Reyes told various people that the fracture occurred while Reyes was roughhousing with Hayden or while Reyes was trying to stop Hayden from choking on something. Reyes also blamed Hayden's day care for the fracture, and Hayden stopped attending, although Reyes continued to take his two sons to the facility.

In January 2006, while giving Hayden a bath, the girlfriend of Hayden's grandfather noticed bruises on Hayden's back, legs, and head. Laura told her that Reyes had forgotten about Hayden while toilet training him and Hayden had fallen asleep on the toilet, then startled awake and fallen into the toilet. Another time, both Hayden's grandfather and his girlfriend noticed severe bruising of Hayden's groin. Reyes told Laura that Hayden slipped getting out of the bathtub and landed on the track for the shower door. On a separate day, Hayden's grandfather and his girlfriend noticed a cut on Hayden's penis when he was in a bath. Laura was unable to explain that injury. And early in February 2006, Laura observed a bruise on Hayden's abdomen that she believed looked like the tread on a shoe. She drew a picture of the bruise, and the drawing was admitted into evidence at trial. The State contended the drawing matched the tread of Reyes's work shoes.

The State also presented evidence that Hayden regressed in his toilet training after Reyes began dating Laura. Multiple people, including Laura, testified that Hayden was afraid of Reyes. Laura's family members said that Hayden was depressed and reclusive in the days leading up to

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 52449-0-II

his death. Defense counsel, on the other hand, presented testimony from Reyes's family members and friends, including Laura, that Reyes treated Hayden the same as his own children and did not physically discipline him. There was also testimony that Hayden's injuries never worried Laura's family or his primary care doctor enough for them to alert the authorities.

C.      Closing Arguments

In closing arguments, the State argued that a fall from the bunk bed was not what killed Hayden. The State contended that the severe brain injuries that Hayden experienced had to have been caused by significant force. The State highlighted that TR and PR were repeatedly observed jumping off the bunk bed without sustaining any injuries. The State repeated Dr. Duralde's testimony that "you never have bilateral retinal hemorrhaging as a result of an accident." VRP (Feb. 7, 2007) at 932. It also characterized her testimony as concluding that the bruise on Hayden's scalp and a fall from the bunk bed's height could not cause the severe brain injury that Hayden sustained. Instead, the brain injury was caused by violent shaking.

The State emphasized Hayden's other injuries, including his rib fracture and the bruising on his thighs. The State also listed Hayden's prior injuries, including his sprained ankle, broken elbow, bruising on his back and legs, severe bruising to his groin, the tread mark on his abdomen, and the internal injuries that were in the process of healing when he died. The State concluded by explaining that these injuries showed the pattern and extreme indifference necessary to prove homicide by abuse.

In closing, Reyes's trial counsel focused primarily on negating extreme indifference and pattern of abuse elements of homicide by abuse. He argued that Hayden's pediatrician believed his prior injuries to be accidents of an active little boy. Defense counsel then conceded that Hayden

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 52449-0-II

probably died from a single, short incident of violent shaking. Counsel emphasized that a single incident driven by a moment of frustration and followed by immediate remorse was not homicide by abuse and, instead, the jury should find that Reyes committed manslaughter.

The jury convicted Reyes of homicide by abuse and second degree murder. The jury found that Hayden was a particularly vulnerable victim for both counts. The trial court imposed an exceptional upward sentence of 480 months of confinement for the homicide by abuse. It did not impose a sentence for second degree murder.

### III. APPEAL AND PRPS

On direct appeal, we affirmed Reyes's conviction and sentence for homicide by abuse. *State v. Reyes*, noted at 147 Wn. App. 1001, 2008 WL 4355376, at *12. In doing so, we concluded that defense counsel was not ineffective when he conceded Reyes was guilty of manslaughter in closing. *Id.* at *9-10. We explained that "the evidence was overwhelming that Reyes caused Hayd[e]n's death," and "Reyes offered no other credible explanation for Hayd[e]n's fatal injuries." *Id.* at *9. We remanded, however, for the trial court to vacate the second degree murder conviction on double jeopardy grounds. *Id.* at *10. We issued a mandate terminating review in April 2009. Mandate, *State v. Reyes*, No. 36136-1 (Wash. Apr. 8, 2009). Reyes filed a timely PRP in March 2010, raising six issues, which we dismissed. Order Dismissing Pet., *In re Pers. Restraint of Reyes*, No. 40453-2, at 1, 3 (Wash. Oct. 5, 2010).

Reyes filed this PRP in September 2018. With his petition, he submitted a declaration from Dr. Janice Ophoven, a forensic pathologist, and a letter from Dr. Chris Van Ee, a biomechanical engineer. Dr. Ophoven's curriculum vitae indicated that she has been giving presentations

8

No. 52449-0-II

challenging the diagnosis of shaken baby syndrome as a cause of death in children since at least the early 2000s.

Dr. Ophoven asserted, "The testimony of the physician and expert witnesses put forward by the State at Mr. Reyes's trial was scientifically inaccurate and unsound, and the State's arguments based on that testimony were also inaccurate and unsound." Opening Br. in Support of PRP, Decl. of Dr. Janice Ophoven (Ophoven Decl.) at 30. She stated that "many of the critical elements of the testimony of the State's witnesses are no longer generally accepted within the medical community," specifying that "today, it is widely acknowledged that subdural hematomas are not caused exclusively by shaking, retinal hemorrhages do not distinguish abusive injuries, preexisting undiagnosed injuries can greatly complicate a diagnosis, and short falls can and do kill children." *Id.* at 31. She asserted that a "diagnosis of abuse from shaking cannot be made on the basis of presence of the elements of the triad" of symptoms associated with shaken baby syndrome—subdural hematoma, cerebral edema, and retinal hemorrhage. *Id.*

Dr. Ophoven posited that Hayden's head injury could have occurred up to 72 hours before he was taken to the hospital. And she asserted, "The testimony of the State's experts in this case would be totally unsupportable today, and it is hard to believe that even [a shaken baby syndrome] proponent would make such categorical statements." *Id.* at 29. Dr. Ophoven further stated, "The medical evidence is inconsistent with the mechanism of injury alleged by the State. There were no signs that Hayd[e]n was tightly gripped by his arms, chest[,] or shoulders while being shaken, and no signs of whiplash or other neck injuries associated with rapid acceleration/deceleration forces." *Id.* at 30. And she concluded, "There is no scientific analysis, testing or evaluation that could possibly confirm the injuries to this child [were] the result of abuse by Mr. Reyes." *Id.* at 32.

9

No. 52449-0-II

Dr. Van Ee's letter referenced several case studies from 1989, 2001, 2007, 2011, 2015, and 2017 where short falls produced fatal head injuries in children. He discussed the biomechanics of abusive shaking, which bioengineers study primarily through computer modeling. He commented, "The current state of the science is that no study can say with any confidence that shaking can or cannot cause the injuries associated with shaken baby syndrome." Opening Br. in Support of PRP, Dr. Chris Van Ee letter (Van Ee letter) at 8. Dr. Van Ee concluded, "Severe and fatal head injuries can occur from short falls," and "[t]he science in these fields is currently being disseminated, refined, and tested. Rigorous application of the scientific method and further evidence based research will continue to shape our understanding of head injuries and their causes." *Id.* at 12.

Reyes argued that these documents constituted newly discovered evidence regarding the diagnosis of shaken baby syndrome or abusive head trauma that merited a new trial or at least resentencing. Reyes argued that experts now had different views than they had at the time of trial about whether symptoms like Hayden's, including bilateral retinal hemorrhaging, cerebral hematoma, and cerebral edema, were indicative of abuse and whether there were other possible causes of Hayden's injuries, like a short fall from a bunk bed.

The State's response to Reyes's PRP included a declaration from Dr. Elizabeth Woods stating that Dr. Ophoven's opinions as stated in her declaration were not widely accepted by the child abuse medical community. Dr. Woods's declaration listed Hayden's injuries, including his bruises, the damage to his internal organs, and his recent history of bruises and bone fractures to support her assertion that Hayden "was a victim of non-accidental trauma over a period of time." State's Resp. to PRP, Decl. of Dr. Elizabeth Woods (Woods Decl.) at 7. And Dr. Woods asserted that Dr. Ophoven's statements about the medical community's understanding of head trauma were

No. 52449-0-II

"in direct contradiction" to the positions of at least eight major medical organizations. *Id.* at 8. The State also attached Reyes's presentence report, a 2011 article by Dr. Patrick Barnes discussing imaging of brain injuries in children, and a 2016 survey of medical professionals demonstrating that physicians still found a greater resemblance between shaking injuries and car crashes than shaking and short falls.

In February 2020, NBC and KING 5 News published an investigation of Dr. Woods questioning her qualifications as a child abuse expert that Reyes submitted to this court in March 2020. Reyes also directed our attention to a King County Superior Court order describing Dr. Woods's testimony before that court as "'vague'" and "'conclusory.'" Statement of Additional Authority at 1 (Mar. 24, 2020).

After considering the evidence presented with Reyes's PRP and the State's response, this court remanded for a reference hearing for the trial court to answer:

> (1)      Has there been a paradigm shift in the medical community's understanding of the natural, accidental, and non-accidental causes of cerebral edema, subdural hematoma, and/or retinal hemorrhages since Reyes's trial in 2007?
>
> (2)      Has there been a paradigm shift related to recognized [shaken baby syndrome (SBS)] symptoms or the SBS diagnosis, since Reyes's trial in 2007?
>
> (3)      If so, what is the nature of any paradigm shift?
>
> (4)      If so, when did a paradigm shift occur?
>
> (5)      If so, when did Reyes learn of any paradigm shift?

Order for a Reference Hr'g at 1-2 (May 27, 2020).

11

No. 52449-0-II

IV. REFERENCE HEARING

A.      Testimony and Evidence

The 12-day reference hearing involved testimony from 12 witnesses: 9 doctors, a biomechanical engineer, Reyes's trial counsel, and a litigation attorney who had experience with cases involving shaken baby syndrome and who had written a book challenging that diagnosis. The State did not call Dr. Woods.

A prominent issue in the reference hearing was the definition of "paradigm shift," which is not a term of art. The phrase "paradigm shift" arose from Justice Gordon McCloud's dissent in *In re Personal Restraint of Fero*, and was critiqued by Justice Yu's concurrence—both opinions use the term to describe the alleged change in the medical community's thinking regarding the symptoms of shaken baby syndrome. *See* 190 Wn.2d 1, 23-24, 409 P.3d 214 (2018) (Yu, J., concurring); *id.* 43-46 (Gordon McCloud, J., dissenting). Our order remanding to the trial court used the term, despite the lack of a legal definition, and the trial court's findings repeat the term.

At the reference hearing, Reyes argued changes in the language used by some experts and certain medical organizations constituted a paradigm shift. The State countered that incremental developments and ongoing controversy did not constitute a paradigm shift. Instead, a paradigm shift required a change in the overall literature, beyond the conflicting testimony of individual experts.

Another key issue was the timing of any potential paradigm shift, or appearance of newly discovered evidence. Dr. Van Ee testified that it has been known since the 1940s that 50-inch falls can cause complex skull fractures even in adults, stating, "If we didn't think short falls could cause injury, we wouldn't put bike helmets on children . . . [or] wood chips below playground

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 52449-0-II

equipment." VRP (Nov. 2, 2020) at 422. Dr. Van Ee acknowledged that he testified in 2007 that the biomechanical community did not believe at that time that a single shake of a child could produce subdural hematoma. *Id.* at 435-36.

The State provided evidence that in 2001 Dr. John Plunkett published a widely known article discussing case studies of short falls causing severe and sometimes fatal head injuries, and he was testifying in support of that theory before 2007. And Dr. Ophoven acknowledged that she had been testifying consistently with her declaration in support of Reyes's PRP since the early 2000s. Dr. Barnes, Dr. John Galaznik, and Dr. Ronald Uscinski were also testifying and publishing articles before 2007 challenging aspects of the shaken baby syndrome diagnosis. Dr. Plunkett testified in support of the short fall defense in a 2004 shaken baby case in Pierce County. Reyes's trial counsel chose not to pursue the short fall defense due to the overall facts of Reyes's case and recommendations of several experts, including Dr. Uscinski and possibly Dr. Plunkett.

Both Dr. Ophoven and the State's experts testified that major medical organizations still endorsed the diagnosis of abusive head trauma from findings of retinal hemorrhage, subdural hematoma, and cerebral edema. The trial court also admitted into evidence a 2004 study that indicated that children with accidental brain injuries from car crashes and short falls were more likely to present skull fractures than children with "inflicted" brain injuries. Suppl. Clerk's Papers (SCP) at 175-76. Dr. Sandeep Narang and Dr. John M. Lacy also testified that it was known before 2007 that short falls can cause brain injury and death, although retinal hemorrhage and subdural hematoma remain primarily associated with abusive head trauma.

The reference hearing's central issue was the actual nature of any shift in the medical community's understanding of shaken baby syndrome, the associated symptoms, and injuries that

13

No. 52449-0-II

were possible from short falls. Reyes presented evidence of gradual scientific developments regarding the mechanics of shaking and new theories that have yet to gain widespread acceptance positing alternative explanations for the causes of retinal hemorrhage and subdural hematoma. One of Reyes's experts, Dr. Julie Mack, testified about a 2009 article she published proposing an alternative source for subdural bleeding. Dr. Mack also pointed to a 2016 report by a Swedish organization that was critical of most then-existing shaken baby syndrome research, although the report itself was heavily critiqued. Another of Reyes's experts, Dr. Roland Auer, acknowledged that no major medical organizations had endorsed the Swedish report.

Reyes also focused on language from a 2001 American Academy of Pediatrics (AAP) technical report that contained statements such as, "data regarding the nature and frequency of head trauma consistently support the need for a presumption of child abuse when a child younger than 1 year has suffered an intracranial injury." Reference Hr'g Ex. 30, at 1. The 2001 report cautioned that physicians should search for additional abdomen injuries, including bruising and rib fractures, to substantiate the shaken baby syndrome hypothesis, and noted that retinal hemorrhaging is "characteristic" of shaking. *Id.* at 2. The 2001 report does not use the word "pathognomonic." VRP (Oct. 28, 2020) at 168. Nor does it say that bilateral retinal hemorrhaging is diagnostic of abuse.

The trial court also admitted a 2007 AAP policy statement. AAP reports may take several years to produce and automatically expire five years after publication unless reaffirmed. The 2007 statement used "abusive head trauma" to describe the potential diagnosis of children with "subdural and subarachnoid hematomas, multiple subdural hematomas of differing ages, more extensive retinal hemorrhages, and associated cutaneous, skeletal, and visceral injuries."

14

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 52449-0-II

Reference Hr'g Ex. 34, at 5. The 2007 statement cited two studies, one from 2001 and the other from 2005, to support its assertion that "short falls may result in bruising; however, more significant types of head trauma, including skull fractures, are exceedingly uncommon but possible." *Id.* at 4. The 2007 statement also issued a cautionary word to physicians about overdiagnosing abuse, explaining, "An injury pattern is rarely pathognomonic for abuse or accident without careful consideration of the explanation provided." *Id.* The trial court also admitted a 2018 AAP consensus statement, which declared, "There is no controversy concerning the medical validity of the existence of [abusive head trauma], with multiple components including subdural hematoma, intracranial and spinal changes, complex retinal hemorrhages, and rib and other fractures that are inconsistent with the provided mechanism of trauma." Reference Hr'g Ex. 65, at 1.

The trial court also admitted a 2020 AAP policy statement. The 2020 statement declares, "The AAP continues to affirm the dangers and harms of shaking infants [and] continues to embrace the 'shaken baby syndrome' diagnosis as a valid subset of the [abusive head trauma] diagnosis." Reference Hr'g Ex. 76, at 1. The National Institutes of Health also still endorsed the shaken baby syndrome diagnosis in 2020. And Dr. Narang, one of the 2020 AAP statement's authors, testified that the medical community still widely accepts shaking as a mechanism of injury, that retinal and subdural hemorrhages are associated with shaking and abusive head trauma over accidents, and that no major medical organization has disavowed the diagnosis of shaken baby syndrome.

B.      Trial Court Findings

The trial court entered extensive findings, declaring overall: "The evidence here is that there has not been a paradigm shift since 2007 with respect to shaken baby syndrome, the medical

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

community's acceptance of shaking as a mechanism of injury, the symptoms associated with shaking, the causes of those symptoms, or the diagnosis of injury by shaking." SCP at 29. The trial court found that since 2007 there had not been a major shift in the medical community's understanding of the natural causes of cerebral edema, subdural hemorrhage, and retinal hemorrhage, short falls as an accidental cause of brain injury and death, accidental causes of retinal hemorrhages, or the validity of shaking as a mechanism of injury. The trial court explained, "A paradigm shift is demonstrated when a new and significantly different framework is adopted and generally accepted by a majority of the medical community in replacement of the old framework." SCP at 17. This definition was consistent with the newly discovered evidence standard.

The trial court addressed the testimony of each expert witness and in some cases made credibility determinations. The trial court found that Dr. Van Ee, Reyes's biomechanical expert, established that the biomedical community understood before 2007 that short falls could cause serious brain injury and death. The trial court found that Dr. Patrick Lantz, another expert who testified for Reyes, offered an overly simplified view of the progression of the medical community's understanding of the import of retinal hemorrhages. And the trial court found that Dr. Ophoven has been testifying since the early 2000s that shaking does not cause subdural hematoma, retinal hemorrhage, and cerebral edema. The trial court also found that Reyes's trial counsel consulted with experts before trial, including a leading expert on short falls who had testified in another then-recent Washington case, about the possibility of a short fall defense.

The trial court also found that another of Reyes's experts, Dr. Galaznik, focused too narrowly on the language of the 2001 AAP policy statement as evidence of the medical community's overall opinion in 2007. The trial court found that the 2001 AAP report "contained

No. 52449-0-II

language contradicting prior medical publications documenting that short falls could result in serious injury or death." SCP at 19. The trial court found that the 2001 AAP report did not represent the entire medical community's opinion of short falls during Reyes's trial and that "[n]umerous studies, articles, and presentations between 2001 and 2006 reiterated the correct and previously known belief that short falls could on rare occasions result in serious brain injury or death." SCP at 20. And the trial court found AAP statements published both before and after the 2001 report "acknowledged that short falls could occasionally result in serious brain injury or death." *Id.*

The trial court found the State's experts to be credible. These experts established that even before 2007, the medical community understood short falls could rarely cause serious brain injury and death. The State's experts explained that the medical community understood in 2007 the presence of certain symptoms created a likelihood that abuse occurred, but no symptom or set of symptoms was conclusive of abuse. Shaking is a mechanism that is still strongly associated with retinal hemorrhages and subdural hematoma.

The trial court found that since 2007 there has not been a major shift in "the medical community's understanding that cerebral edema, subdural hematoma, and retinal hemorrhage are recognized symptoms of shaking as a mechanism of injury," or regarding the diagnosis of shaken baby syndrome or shaking as a nonaccidental source of retinal hemorrhaging. SCP at 23. The trial court found that before Reyes's trial, "there were many terms used to describe injury by shaking and the medical community understood there was potential for impact during an abusive episode involving shaking. Changing nomenclature following [Reyes's] 2007 trial does not constitute or reflect a paradigm shift." SCP at 27.

17

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 52449-0-II

The trial court found that improved "understanding of some aspects of the data and symptoms of shaken baby syndrome has not altered the medical community's framework of understanding of the shaken baby diagnosis. New studies providing nuance and a better understanding of a phenomenon leaving the framework unchanged do not show a paradigm shift." SCP at 28. The trial court concluded that this court's questions asking when the shift occurred and when Reyes learned of it were not applicable because no paradigm shift had occurred.

The trial court's findings provide the answers necessary for this court to conduct a newly discovered evidence analysis.

V. SHOW CAUSE MOTION

In March 2021, NBC and KING 5 News published another article stating that in June 2020, prosecutors had begun sending letters to defense attorneys disclosing that Dr. Woods's credibility has been called into question. The article also indicated that Dr. Woods had left her position as director of Mary Bridge's Child Abuse Intervention Department and that she no longer provided reports to Child Protective Services.

In May 2021, Reyes filed a motion to show cause in this court seeking immediate release from incarceration based on the new information about Dr. Woods. This court denied that motion. Reyes also moved to strike Dr. Woods's declaration in support of the State's response to Reyes's PRP, and he requested sanctions against the State for violating its duty of candor by not alerting Reyes and this court to the newest evidence regarding Dr. Woods's credibility.

Reyes argues that this court should strike Dr. Woods's declaration, issue sanctions against the State, grant his PRP, and order a new trial or, at least, resentencing. As a further alternative, he

18

No. 52449-0-II

seeks leave to amend his PRP to add claims for ineffective assistance of counsel, false testimony, and violation of his right to control his defense.

ANALYSIS

I. NEWLY DISCOVERED EVIDENCE

A.      Personal Restraint Petition Time Bar

RCW 10.73.090(1) imposes a one-year time limit on PRPs "if the judgment and sentence is valid on its face and was rendered by a court of competent jurisdiction." This court issued a mandate terminating review of Reyes's direct appeal in April 2009. Reyes did not file this PRP until September 2018, over nine years later. To circumvent the time bar, Reyes must show that his petition "is based solely on" one of six exceptions. RCW 10.73.100. Reyes asserts that newly discovered evidence entitles him to a new trial, which is an exception to the time bar "if the defendant acted with reasonable diligence in discovering the evidence" and filing their PRP. RCW 10.73.100(1).

We review claims of newly discovered evidence using the same test regardless of whether the claim is raised in a PRP or a motion for new trial. *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 319, 868 P.2d 835 (1994). We will not grant a new trial for newly discovered evidence unless the petitioner demonstrates the evidence was discovered after the trial, "'could not have been discovered before trial by the exercise of due diligence,'" "'will probably change the result of the trial,'" is material, and "'is not merely cumulative or impeaching.'" *In re Pers. Restraint of Brown*, 143 Wn.2d 431, 453, 21 P.3d 687 (2001) (quoting *State v. Williams*, 96 Wn.2d 215, 222-23, 634 P.2d 868 (1981)). If the petitioner fails to demonstrate any of the above factors, they are not entitled to a new trial. *Id*.

19

No. 52449-0-II

B.      Substantial Evidence

Reyes argues that the trial court's findings of fact "ignore the then-controlling 2001 AAP Report" and are not supported by substantial evidence. Pet'r's Suppl. Br. in Support of PRP at 28. We disagree.

Amici Center for Integrity in Forensic Sciences and The Innocence Network urge that in applying the newly discovered evidence rule, we should instead determine whether Reyes's new evidence meets the requirements for showing the evidence could not have been discovered prior to trial with the exercise of due diligence. We agree with amici that the touchstone of our analysis should be the test for identifying newly discovered evidence.

We review factual findings arising from PRP reference hearings for substantial evidence. *In re Pers. Restraint of Stenson*, 174 Wn.2d 474, 488, 276 P.3d 286 (2012). "'Substantial evidence exists when the record contains evidence of sufficient quantity to persuade a fair-minded, rational person that the declared premise is true.'" *Id.* (internal quotation marks omitted) (quoting *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 410, 972 P.2d 1250 (1999)). Even if there is conflicting evidence, we will not disturb findings of fact that are supported by substantial evidence. *Merriman v. Cokely*, 168 Wn.2d 627, 631, 230 P.3d 162 (2010). "'Credibility determinations are for the trier of fact' and are not subject to review." *State v. Cardenas-Flores*, 189 Wn.2d 243, 266, 401 P.3d 19 (2017) (quoting *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990)).

Reyes's supplemental brief raises issues with only a handful of specific findings, as well as broadly citing to large page ranges of the trial court's findings of fact. Ordinarily, a trial court's unchallenged findings "will be treated by this court as verities on appeal, and review will be limited to determining whether the findings support the conclusions of law." *Fuller v. Emp't Sec. Dep't*,

20

No. 52449-0-II

52 Wn. App. 603, 605, 762 P.2d 367 (1988). We address those findings where Reyes has made his challenge clear.

1.      Newly discovered evidence standard

As a preliminary matter, "paradigm shift" is not a term of art that appears anywhere in the newly discovered evidence rule. *See* RCW 10.73.100. No five justices agreed on any definition of "paradigm shift" as it appeared in the dissents and concurrences of *Fero*, so the phrase is not a term of art that sets any quantifiable benchmark. *See* 190 Wn.2d at 23-24 (Yu, J., concurring); *id.* at 43-46 (Gordon McCloud, J., dissenting). We agree with amici that the touchstone of our analysis should be the test for identifying newly discovered evidence. Here, the trial court appropriately focused on whether the allegedly newly discovered evidence in the form of expert testimony could have been discovered with reasonable diligence before trial, and whether any of that testimony would probably change the result of trial.

2.      2001 AAP report findings

Reyes argues that changes in the language of the AAP reports represented a change in available expert testimony after his trial. The trial court disagreed. We agree with the trial court.

The 2001 AAP report discussed a constellation of symptoms including "retinal hemorrhages, subdural and/or subarachnoid hemorrhages, and little or no evidence of external cranial trauma" that do "not occur with short falls" Reference Hr'g Ex. 30, at 1. The report also stated that retinal hemorrhages are "characteristic of shaken baby syndrome." *Id.* at 2. The trial court found that "[t]he 2001 AAP Technical Report, published shortly before [Dr.] Plunkett's 2001 publication, contained language contradicting prior medical publications documenting that short

21

No. 52449-0-II

falls *could* result in serious injury or death" and did not represent the entire medical community's understanding of the effects of short falls at the time of Reyes's trial. SCP at 19 (emphasis added).

The State presented evidence the AAP decided to revise the 2001 statement before 2007, and that AAP reports automatically expire after five years. The trial court heard testimony that at least six experts were publishing articles and testifying against the shaken baby syndrome hypothesis between 2001 and 2007, and at least two of those experts were arguing that short falls could produce the same set of injuries as violent shaking. One of those experts was Dr. Plunkett, who published his short fall case study in 2001. The trial court also heard testimony from Dr. Van Ee that it has been known since the 1940s that falls of less than five feet can cause severe head injuries, even in adults.

The trial court heard some conflicting evidence from experts on this topic. But credibility determinations are the sole providence of the trial court. *Cardenas-Flores*, 189 Wn.2d at 266. A rational, fair-minded person could conclude from the evidence that the 2001 AAP statement did not represent the medical community's standard regarding injuries from short falls in 2007 and that experts were available at the time of trial to testify that short falls could cause the constellation of injuries discussed in the report. *Stenson*, 174 Wn.2d at 488. We hold that substantial evidence supported the trial court's finding that the 2001 AAP report did not represent the only expert opinion in the medical community regarding short falls in 2007.

3.     Substantial evidence of the lack of *newly discovered* evidence

Reyes argues that substantial evidence does not support the trial court's ultimate findings that none of Reyes's experts demonstrated *newly discovered* evidence. We disagree.

22

No. 52449-0-II

The trial court heard evidence that multiple experts were testifying during the early 2000s that the constellation of symptoms described above was not conclusively diagnostic of shaken baby syndrome. Dr. Galaznik, one of Reyes's experts, admitted that he testified in January 2007 in a Wisconsin case that the science surrounding shaken baby syndrome had dramatically evolved in the previous decade, "challenging the overriding paradigm" at the time. VRP (Oct. 29, 2020) at 329. Dr. Van Ee testified that the biomechanical community has questioned the hypothesis of shaken baby syndrome since the 1980s. Dr. Plunkett testified in 2004 offering a short fall explanation for the constellation of symptoms associated with shaking. And before Reyes's trial, both Dr. Ophoven and Dr. Van Ee testified consistently with their declarations filed in support of Reyes's PRP.

There was also testimony at the reference hearing that the AAP and National Institutes of Health still endorse shaken baby syndrome as a subset of the abusive head trauma diagnosis. These organizations still recognize shaking as a source of serious head injury in young children. Additionally, no major medical organization has entirely disavowed the diagnosis of shaking where there are symptoms such as retinal hemorrhage and subdural hematoma. And the trial court heard testimony that the 2016 Swedish report that critiqued the science surrounding shaken baby syndrome was itself heavily critiqued and had not been endorsed by any major medical organizations.

The trial court found the medical community "generally understood prior to 2007" and "continued to generally understand after 2007" that "there were natural causes rarely resulting in cerebral edema, subdural hematoma, retinal hemorrhages, or a combination of these symptoms." SCP at 17-18. The trial court found the medical community understood long before 2007 that short

No. 52449-0-II

falls could cause serious head injuries, including retinal hemorrhages, and that there was testimony available to support that argument in the early 2000s that is also available today. The trial court recognized that the biomechanical community has not been able to confirm before or since 2007 that shaking without impact can cause brain injuries consistent with shaken baby syndrome.

The trial court found the medical community believed that shaking could cause cerebral edema, subdural hematoma, and retinal hemorrhaging before 2007 and continues to believe that today, despite the 2016 Swedish report and controversy about the effect of shaking with impact versus pure shaking. The trial court recognized that physicians considered the totality of circumstances and ruled out alternative possible causes of symptoms as part of a shaking diagnosis before 2007 and continued to do so in 2020. And the trial court found the medical community has used a variety of terms interchangeably to describe the same set of symptoms, including, "[S]haken-impact syndrome, battered infant syndrome, non-accidental head injury, shaken baby syndrome, and abusive head trauma." SCP at 26.

The trial court's overall finding was that there was controversy in the medical community in the early 2000s that continues today regarding the degree to which short falls, blunt force trauma, and shaking cause similar symptoms. To that extent, the conflicting evidence supports the assessment that there was and is ongoing controversy. *Merriman*, 168 Wn.2d at 631. But a rational, fair-minded person could conclude that there has not been newly discovered evidence affecting the medical community's understanding of the natural, accidental, and nonaccidental causes of cerebral edema, subdural hematoma, and/or retinal hemorrhages, or shaken baby syndrome symptoms and diagnosis since Reyes's trial in 2007. *Stenson*, 174 Wn.2d at 488.

24

No. 52449-0-II

#### 4. New evidence must probably change the outcome of trial

To support his assertion of newly discovered evidence, Reyes also focuses on Dr. Duralde's testimony and corresponding statements in the State's opening and closing arguments at Reyes's trial that "[r]etinal hemorrhaging, bilaterally, has not been seen in any cases of accidental blunt force trauma" and "of the hundreds to thousands of cases that have been reviewed of head trauma in children, there have never been bilateral retinal hemorrhages in any kind of accidental blunt force trauma." VRP (Jan. 29, 2007) at 258-59. Reyes argues that the State conceded at the reference hearing that such statements were false. But Dr. Ramoso testified at Reyes's trial that Hayden's death could have been caused by shaking or shaking with impact and acknowledged the controversy surrounding the diagnosis. And at the reference hearing, these assertions were tempered—not outright rejected, as Reyes suggests—by testimony of experts who explained that such accidental causes of these symptoms were rare, rather than impossible.

Reyes also argues the State has now conceded as false its expert testimony and argument at trial that Hayden's injuries could not have been caused by a fall from a bunk bed and that shaking injuries frequently resemble high-speed car crashes and multi-story falls. But the State presented evidence at Reyes's trial that the incidents causing bruises on Hayden's head were not the source of his brain injuries, and Reyes offers no new evidence suggesting otherwise. Moreover, even if we conclude that prevailing scientific evidence at the time of trial did not support Dr. Duralde's more absolute statements, this does not warrant granting Reyes's PRP because even if these statements had been excluded or more directly contradicted by other experts at trial this would not probably have changed the result. *Brown*, 143 Wn.2d at 453.

25

No. 52449-0-II

At Reyes's trial, the State presented evidence that Hayden sustained catastrophic brain injuries but no skull fracture, strongly suggesting a shaking injury. When he died, Hayden had bruising across his body, a broken rib that was indicative of shaking, and healing but serious injuries to six internal organs that were inflicted days or weeks before his death, further indicating abuse. And the State presented evidence that Hayden began acquiring broken bones and a series of suspicious bruises after Reyes entered his life, for which Reyes provided inconsistent explanations. Hayden's stepbrother told police on the night of Hayden's collapse that he did not see Hayden fall from the bunk bed. Before Reyes's trial, his defense counsel spoke to leading experts about the possibility of a short-fall defense. In closing, defense counsel conceded that Reyes had shaken Hayden, and we held on direct appeal this was not ineffective assistance of counsel. *Reyes*, 2008 WL 4355376, at *9-10.

Reyes asserts, primarily through Ophoven's declaration, that a fall from the bunk bed is the "only reasonable" explanation for Hayden's injuries. Ophoven Decl. at 32. This argument is wholly unconvincing in light of the weight of the State's evidence. To merit a new trial, Reyes must show more than the *possibility* of a different outcome; he must demonstrate that allegedly new evidence would *probably* change the result of his trial. *Brown*, 143 Wn.2d at 453. The record fails to show that Hayden suffered from any medical conditions that caused or contributed to his injuries. The State's experts established that it would be rare for an accident to cause Hayden's catastrophic brain injuries without a skull fracture, and his rib fracture was indicative of shaking. Had Reyes presented testimony confirming that short falls can rarely cause catastrophic brain injury and that retinal hemorrhaging is not conclusively diagnostic of abuse, the outcome of his trial would not likely have been different.

26

No. 52449-0-II

We hold that Reyes presented no new evidence that could not have been discovered prior to trial with the exercise of due diligence, he has not shown that his purported new evidence would have probably changed the outcome, and his PRP is therefore time barred. RCW 10.73.090(1), .100. We deny Reyes's request for a new trial or resentencing.

C.      Judicial Estoppel

Reyes argues that the State's position at the reference hearing constituted a complete reversal from its position at Reyes's 2007 trial and that the State essentially conceded that the expert statements it used to convict Reyes were false, meriting application of judicial estoppel. We disagree.

Judicial estoppel applies when a party's later position is clearly inconsistent with its previous position, accepting the new position would create the perception that a court was misled, and the party gains an unfair advantage from the change in position. *Miller v. Campbell*, 164 Wn.2d 529, 539, 192 P.3d 352 (2008). Specifically, "[e]stoppel applies only when a party takes one position in a court proceeding and later seeks an advantage by taking 'a *clearly inconsistent position.*'" *State v. Numrich*, 197 Wn.2d 1, 24-25, 480 P.3d 376 (2021) (quoting *Arkison v. Ethan Allen, Inc.*, 160 Wn.2d 535, 538, 160 P.3d 13 (2007)).

Reyes contends that at his 2007 trial, the State endorsed the theory of shaken baby syndrome and argued that short falls could not possibly have caused Hayden's injuries, then reversed that position at the 2020 reference hearing to assert that the consensus in 2007 *was* that a short fall could have caused Hayden's injuries. The State counters that none of the elements of judicial estoppel are met, and that its position was and has remained that Hayden's death was not the result of a short fall.

27

No. 52449-0-II

The issues at trial and at the reference hearing were different. At trial, the State's position was that Reyes had killed Hayden through a pattern of abuse. At the reference hearing, the issue was, in part, whether the medical community's framework for finding and addressing the shaken baby diagnosis and its symptoms had changed between 2007 and 2020. The relevant issue after the reference hearing is whether Reyes's new evidence was truly newly discovered and could not have been discovered with due diligence before trial. *Brown*, 143 Wn.2d at 453. Arguing a scientific theory was fully available to Reyes at the time of trial does not contradict the State's position that Reyes was guilty of homicide by abuse. Because of the distinct nature of the two proceedings and the questions presented, the State's two positions are not clearly inconsistent and, thus, judicial estoppel does not apply. *Numrich*, 197 Wn.2d at 24-25.

We will not judicially estop the State from maintaining that Reyes could have caused Hayden's death by shaking him, and that there has not been a change in the available expert testimony regarding shaken baby syndrome diagnoses and symptoms since 2007. Reyes could have presented expert testimony in 2007 that short falls can cause severe brain injury and that bilateral retinal hemorrhages were not conclusively diagnostic of abuse, as other defendants around that time had done. *See State v. Womac*, 130 Wn. App. 450, 123 P.3d 528, *aff'd in part and reversed in part*, 160 Wn.2d 643, 160 P.3d 40 (2007).

Because substantial evidence supported the trial court's findings and judicial estoppel does not apply, we hold that Reyes has failed to overcome the time bar in RCW 10.73.090. We therefore dismiss Reyes's PRP as untimely.

No. 52449-0-II

D.       Request to Amend PRP

In addition to his assertion of newly discovered evidence, Reyes seeks leave to amend his PRP pursuant to RAP 16.8(e) to include claims for ineffective assistance of counsel, false testimony, and violation of his right to control his defense. The State counters that the amendments would result in a mixed petition and cannot be adjudicated on the existing record.

The State is correct. Because we conclude that the sole claim made in Reyes's current petition is untimely, adding additional claims would, at best, create a mixed petition. The exceptions to the one-year time limit can only overcome the time bar if the PRP is based *solely* on one of the exceptions in RCW 10.73.100. Moreover, Reyes does not show how his claims of ineffective assistance of counsel, false testimony, and violation of the right to control one's defense fit within the exceptions to the time bar under RCW 10.73.100. We deny Reyes's request to amend his PRP to create a mixed petition and add untimely claims.

II. IMPEACHMENT EVIDENCE REGARDING DR. WOODS

A.       Motion to Strike Dr. Woods's Declaration

Reyes argues that we should strike Dr. Woods's declaration due to the publication of news articles undermining her credibility. We disagree.

Dr. Woods played no role in Reyes's initial trial and she was not called as a witness in the reference hearing. At the reference hearing, the State offered testimony from four other expert witnesses without discussing Dr. Woods's declaration. The fully developed testimony at the reference hearing has rendered Dr. Woods's declaration moot at this stage and we need not rely on it. Although we do not give Dr. Woods's declaration any weight in our current analysis, "a motion to strike is typically not necessary to point out evidence and issues a litigant believes

29

No. 52449-0-II

this court should not consider." *Engstrom v. Goodman*, 166 Wn. App. 905, 909 n.2, 271 P.3d 959 (2012). We deny the motion to strike.

B.          Request for Sanctions

Relying on the Rules of Professional Conduct, Reyes asks this court to impose sanctions against the State for not retracting Dr. Woods's declaration in light of the newest impeachment evidence against her and "for disregarding its duty of candor and its duty to disclose new, credible, and material evidence that suggests [Reyes] was wrongly convicted." Pet'r's Mot. for an Order to Show Cause as to why Pet'r's PRP Should not be Granted Immediately at 18-19 (May 17, 2021). But only the Supreme Court can ultimately enforce the Rules of Professional Conduct. *See Graham v. Wash. State Bar Ass'n*, 86 Wn.2d 624, 631, 548 P.2d 310 (1976) (stating that the power to regulate the practice of law lies within the sole jurisdiction of the Supreme Court). Reyes argues that because he has proved his innocence with new evidence, the State committed a violation of the Rules of Professional Conduct by not raising the new evidence itself. Because this court has no authority to enforce the Rules of Professional Conduct, we decline. Reyes offers no other authority supporting his request for sanctions. Therefore, we deny the request.

No. 52449-0-II

CONCLUSION

We affirm the reference hearing findings and dismiss the PRP as untimely. We deny the request to strike Dr. Woods's declaration and the request for sanctions.

_____
Glasgow, A.C.J.

We concur:

_____
Maxa, J.

_____
Veljacic, J.