IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of<br><br>S.A. | No. 88003-9-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, C.J. — S.A. appeals from the superior court order that committed her for up to 180 days of involuntary treatment. She asserts that the court did not have statutory authority to order such treatment and substantial evidence does not support its order. We disagree and affirm.

FACTS

In late November 2024, a designated crisis responder (DCR) filed a petition seeking to hospitalize S, a 14-year-old individual, for a short period for initial evaluation and treatment. The DCR alleged that S had not showered in six months, was urinating in her bedroom closet and would not allow her parents to clean it, had not attended school in three years, had refused mental health and medical treatment, had dental pain but refused to go to the dentist, barely ate any food and, when she did, only ate sandwiches from a specific Starbucks café in Seattle.[1] The DCR further contended that while meeting with S and her parents in

---

[1] A later-submitted declaration in support of continued involuntary treatment of S stated that at the time of her initial hospitalization, S had not brushed her teeth in six months and was engaging in ritualistic behaviors surrounding her food intake, including often spending up to $100 per day on Starbucks food and drinks.

their home, S was "disheveled and highly malodorous," with "greasy and matted" hair. He also asserted that S had destroyed property inside of the home, regularly assaulted her parents, and during his interview with them, assaulted him as well as both of her parents. He stated that her "[f]amily indicated they are unable to provide sufficient care at this time," determined that she was gravely disabled, and recommended that she be detained for involuntarily hospitalization." On December 1, Seattle Children's Hospital admitted S for involuntary evaluation and treatment.

On December 4, advanced registered nurse practitioner (ARNP) Jeffrey Kljaich, a mental health provider with the hospital, filed a petition for an additional 14 days of involuntary evaluation and treatment for S. Kljaich alleged that while S was hospitalized pursuant to the initial petition, she,

> continued to exhibit many of the same symptoms that led to her initial detainment. She continued to refuse bathing herself even with bath wipes or a shower cap. She had several instances where she had urinated inappropriately on the floor due to fear that the toilet and restrooms here are contaminated and dirty, despite being cleaned nightly. She had two large mats in her hair that she refused staff to touch or begin to detangle. She saw no issue with the severity of her symptoms or behaviors.

He further stated that S had been "advised of the need for voluntary treatment," was "unwilling or unable to consent to necessary treatment," and had been "advised that involuntary commitment pursuant to this 14-day petition will result in the loss of firearm rights."

In late December, a commissioner of the trial court held a probable cause hearing on the 14-day petition, with S represented by a guardian ad litem (GAL) and legal counsel. As part of advising S regarding the potential loss of her right to

possess firearms, the trial court ensured that S had a written copy of the advisement and informed her, along with her GAL, as follows:

> [I]f you don't voluntarily agree to remain in the hospital, if, at the end of this hearing, the [c]ourt determines you will involuntarily remain in the hospital, you will lose your constitutional right to possess a firearm, and that right can only be reinstated with a court order. And I realize that that firearms advisement refers to RCW 71.05, but the provision in 71.34 is the same thing. So the advisements for minors is the same as the advisements for adults.

Then, during the State's first witness's testimony, S requested to speak with her legal counsel, and following a private consultation, her counsel represented the following to the court commissioner:

> After discussion—further discussion with [S] and with her guardian ad litem . . . I do believe that we are able to discharge the guardian ad litem at this time and [S] would like *to agree to the 14-day order*.

(Emphasis added.)

The commissioner determined that S had agreed to the entry of a 14-day involuntary commitment order and later entered a written order that she be hospitalized for 14 days of involuntary treatment. The order specifically set forth that S, "after consultation with counsel, voluntarily submitted [herself] to the jurisdiction of the [c]ourt and agreed to the entry of an order of commitment for behavioral health treatment." The order also set forth that S was advised on the record that she would be prohibited from possessing firearms, and "was provided advisement on the record before she stipulated to agreed order." S did not appeal or otherwise challenge the entry of the 14-day commitment order.

On January 10, 2025, ARNP Alysse Craft, another treating provider at the hospital, filed a petition to commit S for up to 180 days of further involuntary

treatment. Craft alleged that S was gravely disabled because, as a result of a mental disorder, she was in danger of serious physical harm resulting from a failure to provide for her essential human needs of health or safety. Craft alleged that S had obsessive-compulsive disorder (OCD) with contamination fears and was unable to meet her basic hygiene needs or manage her food intake without support. In a sworn declaration submitted in support of her petition, Craft stated,

> [S] has expressed a strong aversion to touching objects she does not perceive as "clean," and she believes that tap water is contaminated. Her compulsions include avoiding objects touched by others (such as chairs or door knobs), refusing to shower, wash her hands, or let water touch her skin, and requesting that others clean objects for her. She also insists on using only specific objects that she deems "clean." There is also suspicion of additional obsessions, as [S] engages in ritualized behaviors with unclear purposes, such as walking in a peculiar pattern and refusing to allow her hair to be brushed or to brush her own hair.

Additionally, Craft declared,

> Hospitalization remains necessary as [S] continues to be severely disabled and unable to meet her basic hygiene needs (such as showering and toileting) or manage her food intake without substantial support. If discharged to the community at this time, it is highly likely that she would revert to refusing showers, urinating in her bedroom, neglecting soiled clothing, and rejecting mental health care and medical treatment. Such poor hygiene poses significant health risks, including skin infections, breakdowns or lesions, dental infections, genitourinary infections, and systemic infections. If left untreated or if [S] continues to refuse medical care, these infections could ultimately lead to death. The risk of behavioral regression upon discharge is considerable.

> ARNP Andrew Given,[2] a treating psychiatric nurse practitioner at the

hospital, also submitted a sworn declaration, similarly stating as follows:

> Since admission, [S] has frequently presented as guarded, noncooperative, and her overall adherence to recommended

---

[2] Given is also credentialed as a board-certified psychiatric-mental health nurse practitioner.

treatment, including nutrition and hygiene expectations, has been variable. She often declines to engage in discussion of certain topics relevant to her care and wellbeing and frequently declines to meaningfully engage members of the clinical team. She has exhibited symptoms and behaviors consistent with Obsessive-Compulsive Disorder (OCD) including severe contamination fears and related ritualistic behaviors associated to nutrition (food, water), hygiene (showering, toileting, clothing and bedsheets), as well as particular objects and environments that are part of everyday life and functioning (utensils, chairs, bathrooms).

He further declared,

The severity of these symptoms and behaviors coupled with her limited insight prevents her from consistently meeting her own basic needs (including hygiene and nutrition). She remains severely impaired and requires consistent monitoring and significant support. There is a high likelihood of nonadherence to recommended treatment and decompensation at lower levels of care. Hospitalization remains warranted and ongoing managed treatment is necessary.

In late February, the court held a two-day hearing on Craft's petition. The State presented S' medical records and the testimony of her mother and ARNP Colleen Coyne, another treating provider with the hospital. S' mother testified that S spent "two years without eating at home at all" and had not gone to school for about three years. She also explained that S was previously hospitalized for two weeks in May 2024 and, when discharged from the hospital, S went back to not eating, not showering, and got worse instead of getting better. She further asserted that between May and November, S was not eating more than few bites from sandwiches, did not shower, urinated in her bedroom closet, and was not changing her clothing. S' mother also testified that during S' current hospitalization, S was not eating the food or drinking what was provided to her, her

recovery in the hospital was going "very slow," and her mother believed that S was "going to get worse if she c[ame] out" of the hospital.

S' mother also stated that she and her husband had been visiting S at the hospital, learning about her treatment and how to support her, had applied for disability support, and that she would do her best to take care of S and keep her safe. She further contended, however, that if S were discharged, S "has her own mind and her opinion," S was "going to do whatever she wants," S "didn't do anything" following her last discharge from the hospital, and she was not sure whether, if S were discharged, S "was going to go to school and do whatever she is supposed to do."

Coyne testified that she had evaluated S for the purpose of the 180-day petition and, in doing so, had read S' medical record and interviewed S, her parents, and her treating providers. Coyne explained that S had working diagnoses of OCD and "avoidant/restrictive food intake disorder." Specifically, she stated,

> Obsessive[-]compulsive disorder is marked by really strong obsession. They can vary from person to person.
>    For [S,] she has really strong ideas that water[,] all water[,] is contaminated and that by drinking water, by having water touch her skin or, you know, brushing her teeth using water that she will—that she will get sick or die or something negative will happen to her. The compulsive part of this disorder is the things that you do in order to help alleviate those obsessions. And in [S]'s case those compulsions are not wanting to shower, refusing to eat a wide variety of foods, refusing to change her clothing when she's soiled herself, refusing to brush her teeth. And before coming to the hospital, it included going to the bathroom in her bedroom for quite a while because these fears were really, really strong.

Coyne testified that during S' hospitalization between December 2024 and February 2025, S had gained weight, her nutritional markers were stable, and she had intermittently demonstrated an ability to eat food, appropriately shower, and use the toilet. She further stated, however, that S was receiving "hospital-grade Boost[3] supplementation" for her nutritional needs, but continued to have "intensely poor hygiene," restrictive intake of food for days to weeks, and, although she understood what her treatment providers were asking her to do, had "very poor" insight into her obsessions and compulsions, including not agreeing that "eating or completing her hygiene activities is necessary for her health or wellness." Coyne also explained that S had not consistently followed her prescribed medication regimen or engaged with medical treatment "as recently as yesterday and the day before," continued to demand to exclusively eat food from Starbucks, had refused to wear feminine hygiene products during menstruation, and had refused to clean her bathroom or herself after an episode of incontinence. Coyne testified that S "has become nearly dependent on the Boost nutritional supplement" that hospital staff were providing to S "to prevent her from nutritional deficit" and specified that S "would not have access to [it] outside of the hospital." Coyne additionally noted that "most recently [S] has actually been eating less of her food than she had towards the beginning of hospitalization."

Coyne further testified that a less restrictive treatment alternative (LRA) was not appropriate for S because she "currently requires 24/7 staff to aid her in meeting those basic needs of eating and showering, brushing her teeth, and to

---

[3] Coyne described Boost as a "hospital grade formula" of "nutritional supplement."

encourage treatment," and she "has very consistently shown that she has not engage [sic] in treatment; she does not want to participate in improving her nutrition or improving her hygiene needs." Coyne also opined,

> If [S] doesn't receive treatment in the inpatient setting, I—I would expect her to return to previous behaviors: refusing to eat; refusing to shower, clean her body; refusing to brush her teeth; and urinating in her bedroom; refusing to attend medical or mental health appointments; refusing to attend school. And the consequences of all of those behaviors is putting [S] at serious risk for infections, including skin infections, dental infections, genitourinary infections, systemic infections. And when that's coupled with refusal to engage in medical appointments virtually or present for medical appointments in person, it makes that risk even higher that, if she were to get an infection, she would not—parents would not be able to get her to present for treatment.
> She continues to—she continues to require hospital-level care to complete those basic needs. Left untreated with the refusal of hygiene activities, those kind of infections could ultimately lead to her death.
> And stopping eating for periods of time and then—refusing to eat for periods of time and then resuming eating at a higher— resuming eating sort of suddenly with a high amount of calories, which [S] has also done historically—that can also lead to medical destabilization. The biggest risk is refeeding syndrome which can lead to cardiac death.

The commissioner granted the petition, issued oral and written findings of fact and conclusions of law, and entered an order that committed S for up to 180 additional days of involuntary treatment. S subsequently filed a motion to revise the commissioner's order, which the superior court denied. The court ruled that its order was based on the "findings and conclusions of the commissioner which the [c]ourt affirms and adopts as its own" and further ruled,

> The [c]ourt agrees with and adopts the [c]ommissioner's detailed and well-reasoned order. Key aspects of this matter include the harmful consequences established at the hearing and the principle

established in *LaBelle*[4] that the risk of serious physical harm need not be "imminent" at the time of the hearing.

S timely appealed.

ANALYSIS

This matter comes before us on an appeal from the superior court's order denying S' motion to revise the court commissioner's order that committed her for involuntary treatment for a period up to 180 days.

As a general matter, we have recognized,

> [u]nder RCW 2.24.050, the findings and orders of a court commissioner not successfully revised become the orders and findings of the superior court. A revision denial constitutes an adoption of the commissioner's decision, and the court is not required to enter separate findings and conclusions. *In re Marriage of Williams*, 156 Wn. App. 22, 27-28, 232 P.3d 573 (2010). On appeal, this court reviews the superior court's ruling, not the commissioner's. [*In re Marriage of*] *Stewart*, 133 Wn. App. [545,] 550, [137 P.3d 25 (2006)].

*Maldonado v. Maldonado*, 197 Wn. App. 779, 789, 391 P.3d 546 (2017).[5]

On appeal, S presents several bases on which she asserts that the trial court erred when it entered the 180-day commitment order herein. None are availing.

---

[4] *In re Det. of Labelle,* 107 Wn.2d 1 96, 728 P.2d 138 (1986)

[5] We note that S correctly contends that although her 180-day commitment period has elapsed, the matter is not moot. As identified in her briefing, this court has recognized that "[a]ppeals involving involuntary commitments are not moot because prior involuntary commitment orders have potential collateral consequences." *In re Det. of A.M.*, 17 Wn. App. 2d 321, 324 n.1, 487 P.3d 531 (2021).

I.      Challenge to Validity of 14-Day Involuntary Treatment Order

S asserts for the first time on appeal that the trial court erred when it entered the 180-day involuntary treatment order because no valid 14-day involuntary treatment order was entered in this case.  For several reasons S' assertion fails.

As a preliminary matter, S does not present us with argument or authority in support of the proposition that we may consider this error which she raises for the first time on review.  Under RAP 2.5(a), we

> may refuse to review any claim of error which was not raised in the trial court.  However, a party may raise the following claimed errors for the first time in the appellate court: . . . (3) manifest error affecting a constitutional right.

Here, S did not challenge or otherwise appeal the 14-day commitment order.  Additionally, during the proceedings on the 180-day commitment petition, S did not challenge the validity of the 14-day commitment order as a necessary predicate for the subsequent ITA order either in her closing argument to the commissioner or her motion to revise the commissioner's order granting the 180-day petition.[6]

Her failure to raise this issue in the trial court deprived both the trial court and the State of the opportunity to respond to, and potentially correct, this alleged error.  *See State v. Johnson*, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992).

---

[6] S also asserts, for the first time on appeal, that the court improperly deprived her of the constitutional right to possess firearms when it entered the 180-day involuntary treatment commitment order against her.  Although she presents analysis in support of manifest error under RAP 2.5(a), we need not address this contention because no error exists.

Her briefing explicitly concedes that the "court properly advised her of potential consequences to her firearm rights" at her hearing on the 14-day petition and the remainder of her assertion is predicated on the alleged invalidity of the court's 14-day commitment order.  Given that she does not dispute that she was properly advised pursuant to the 14-day commitment proceeding and the statute that governs 180-day commitments, RCW 71.34.750, does not require further advisement as to the loss of firearms rights in a hearing on such a petition, she fails to demonstrate any error.

Additionally, her appellate briefing does not present any argument or analysis in support of the proposition that such an alleged error is one of constitutional magnitude such that we may consider for the first time on appeal under RAP 2.5(a).[7] Therefore, we decline to review this claim of error.

II.     Substantial Evidence Supports 180-Day Commitment Order

S next contends that the trial court separately erred when it entered the 180-day commitment order because the trial record does not contain substantial evidence to support the entry of such an order. We disagree.

RCW 71.34.750(6) provides,

> For one hundred eighty-day commitment:
>          (a) The court must find by clear, cogent, and convincing evidence that the minor:
>          (i) Is suffering from a mental disorder or substance use disorder;
>          (ii) Presents a likelihood of serious harm or is gravely disabled; and
>          (iii) Is in need of further treatment that only can be provided in a one hundred eighty-day commitment.

Our Supreme Court has instructed that the clear, cogent, and convincing evidence standard

> means the ultimate fact in issue must be shown by evidence to be "highly probable." *See In re* [*Interest of*] *Pawling*, 101 Wn.2d 392, 399, 679 P.2d 916 (1984); *In re* [*Welfare of*] *Sego*, 82 Wn.2d 736, 513 P.2d 831 (1973). Generally, where the trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment. *Ridgeview Properties v. Starbuck*, 96 Wn.2d 716, 719, 638 P.2d 1231 (1982). However, where the State must prove its

---

[7] Although S' briefing does present analysis and application of RAP 2.5(a) with regard to an alleged error concerning the trial court's advisement of her continued loss of her constitutional right to possess firearms at the 180-day commitment petition hearing, she does not present such analysis with regard to her assignment of error regarding the 14-day order.

case by clear, cogent and convincing evidence, the evidence must be more substantial than in the ordinary civil case in which proof need only be by a preponderance of the evidence, *In re [Welfare of] Hall*, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983); in other words, the findings must be supported by substantial evidence in light of the "highly probable" test. *In re Pawling, supra* at 399. Accordingly, we will not disturb the trial court's findings of "grave disability" if supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing.

*In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986).

Additionally, we have recognized,

"'Substantial evidence' is the quantum of evidence sufficient to persuade a fair-minded person" that the premise is true. *In re Det. of H.N.*, 188 Wn. App. 744, 762, 355 P.3d 294 (2015). Furthermore, when evaluating the sufficiency of the evidence, we consider the evidence in the light most favorable to the [p]etitioners. *In re Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459, *review denied*, 193 Wn.2d 1017 (2019).

*In re Det. of A.M.*, 17 Wn. App. 2d 321, 330, 487 P.3d 531 (2021).

On appeal, S does not dispute that she was suffering from a mental disorder during the time in question. Therefore, it is uncontested that S was suffering from OCD and avoidant or restrictive food intake disorder. Rather, S contends that the trial record does not contain substantial evidence supporting the two remaining statutory requirements on which the court relied: that she was gravely disabled, RCW 71.34.750(6)(ii), and that she was in need of further treatment that could only be provided in a 180-day commitment, RCW 71.34.750(6)(iii). As analyzed *infra*, neither contention establishes an entitlement to appellate relief.

A.     Substantial Evidence Supports that S was Gravely Disabled

RCW 71.34.020(27) defines a "[g]ravely disabled minor," in relevant part, as "a minor who, as a result of a behavioral health disorder, (a) is in danger of

serious physical harm resulting from a failure to provide for [their] essential human needs of health or safety." According to our Supreme Court, subsection (a) requires

> recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment *which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded*. Furthermore, the failure or inability to provide for these essential needs must be shown to arise as a result of mental disorder and not because of other factors.

*LaBelle*, 107 Wn.2d at 204-05 (emphasis added).[8]

Here, the trial court concluded that S was gravely disabled as a result of her mental health diagnoses such that she was at a substantial risk of harm because of her inability to provide for her own essential needs of health and safety. As an initial matter, the court found that S engaged in the following behavior while at home for at least six months prior to her December 2024 hospitalization: either she or her parents reported that she was not eating food or drinking water provided to her other than small bites of Starbucks sandwiches; she was urinating on the floor or in her closet; she did not wash her hands, brush her teeth, or shower because she did not like the feeling of water on her skin; she would only defecate in the toilet if her mother cleaned the bathroom before she used the toilet; she would not change her clothes, and she exhibited both noticeable body odor and matted,

---

[8] Although the matter before us is governed by the provisions of chapter 71.34 RCW and the court's decision in *LaBelle* regarded chapter 71.05 RCW, which concerns involuntary commitment for adults, not minors, the definitional language therein is effectively identical to that set forth in chapter 71.34 RCW. *See LaBelle*, 107 Wn.2d at 201-02; *compare* RCW 71.05.020(25), *with* RCW 71.34.020(27).

greasy hair. The court further found that S had been hospitalized in May 2024 but when she returned home, those behaviors continued.

The court also found that S continued to present active symptoms of her disorders over the course of her current hospitalization, including not wanting to drink, touch, or shower in water due to her pervasive belief that all water is contaminated, refusal to eat a wide variety of foods, change her clothes, brush her teeth, or engage in dental care, and a consistent lack of cooperation with hospital staff. Additionally, the court found that S repeatedly reported to her healthcare providers that she had historically resisted bathing and disliked water on her body and her belief that the bathroom toilet seat was dirty and it would be cleaner for her to urinate on the floor. The court specifically found that S

> continues to express fear of touching objects because she believes that they are unclean. She continues to engage in a ritualized behavior as she refuses to brush her hair or allow anybody else to brush it. She recently urinated in her bed while she was fully clothed and couldn't explain why. She continues to skip meals.

The court further found that although S' condition was improving on prescribed medications and she had showered at times, S did not consistently participate in treatment or follow her prescribed medication regimen, was not properly attending to her activities of daily living, refused to wear hygienic products or underwear during menstruation, refused to clean her own bathroom, and did not understand the impact that failing to attend to such activities would have on her health. The court therefore concluded that S was "clearly placing her health at risk due to her behavioral health disorder."

Taking the evidence in the light most favorable to the State, the record contains ample evidence supporting that as a result of S' behavioral health disorders, there was a high probability that she was in danger of serious physical harm resulting from a failure to provide for her essential human needs of health or safety. The record reflects that even in a highly structured environment and only days prior to the hearing on the 180-day commitment petition, she was unable to consistently secure her nutritional or hygienic needs and did not consistently follow her designated treatment, engage in hygienic behavior, or understand the health risks associated with such conduct.

Furthermore, the record supports the conclusion that such a circumstance "presents a high probability of serious physical harm within the near future unless adequate treatment is afforded." *See LaBelle*, 107 Wn.2d at 205. Specifically, the record included sworn declarations and testimony by S' medical providers that her inconsistent eating could result in refeeding syndrome, which could lead to cardiac death, and her poor hygiene combined with her refusal to engage in medical treatment put her at serious risk of skin, dental, genitourinary, and systemic infections, which could also result in her death if left untreated in the context of her unhygienic conduct. Given all of this, substantial evidence supported the trial court's determination that S was gravely disabled.[9] Accordingly S' assertion fails.

_____

[9] S nevertheless relies on the evidence indicating that while hospitalized, she maintained a healthy weight and her lab work was unremarkable in support of the notion that her health and safety were not in imminent risk. However, that some of S' health markers were somewhat stable while she was hospitalized does not meaningfully impact the evidence presented in the trial court reflecting a high likelihood that her inappropriate eating habits and unhygienic conduct, if left untreated, presented a high probability of serious physical harm within the near future. Indeed, S does not contest that if she did not address her conduct, it could result in a syndrome resulting in her death or if she became infected at any point, that such an infection could result in her death. Further, substantial evidence review does not consider whether the record could support some

B. **Substantial Evidence Supports that S Needed Further Treatment that Could Be Provided Only in 180-Day Hospitalization**

As set forth *supra*, "[f]or one hundred eighty-day commitment: (a) The court must find by clear, cogent, and convincing evidence that the minor: . . . (iii) Is in need of further treatment that only can be provided in a one hundred eighty-day commitment." RCW 71.34.750(6). Subsection 8 of that provision states,

> *If the court finds that the criteria for commitment are met and that less restrictive treatment in a community setting is not appropriate or available, the court shall order the minor committed to the custody of the director for further inpatient mental health treatment* . . . . If the court finds that a less restrictive alternative is in the best interest of the minor, the court shall order less restrictive alternative treatment upon such conditions as necessary.

RCW 71.34.750(8)(a) (emphasis added).

Here, the trial court found that a less restrictive environment was not appropriate for S and she was in need of further treatment that could be provided only by way of a 180-day commitment. This was so, the court found, because S' condition had not stabilized and she had become dependent on a hospital-grade supplement for her nutritional intake that could not be provided outside of a hospital setting. The court further found that she had not previously followed through with her promises to engage in her activities of daily living while at home and she had previously returned home from a two-week May 2024 hospitalization only to revert to her prior behaviors. In addition, the court found that S was not capable of independently securing her medicinal, hygienic, and nutritional needs even in the

---

other finding or conclusion by the trial court but, rather, whether the determination reached by the court is properly supported. *See In re Pers. Restraint of Reyes*, 21 Wn. App. 2d 353, 374, 505 P.3d 1234 (2022) ("Even if there is conflicting evidence, we will not disturb findings of fact that are supported by substantial evidence."). Thus, S' claim fails.

context of the highly structured environment of inpatient treatment and with her parents' help. The court further found that S required a "higher level of care than her parents can provide at home at this time," and her mother did not testify that she was ready to take S home but, rather, testified that "if [S] were released at this time, that she believes that [S] will be worse when she gets home because she is not doing well now."

Taking the evidence in the light most favorable to the State, the record plainly contains evidence supporting the court's determination that it is highly probable that the treatment needed by S was that which could only be provided in a 180-day commitment. The record reflects that even in the highly structured environment of an inpatient hospitalization, with her parents' support while hospitalized, she was unable to stabilize her behavioral health disorders, required a higher level of care than her parents could provide at home, and, from her parents' own admission, her condition would worsen if she were discharged and returned home. Indeed, as the court found, this "does not bode well for compliance with a less restrictive treatment order at this time." Thus, substantial evidence supports the trial court's determination herein.[10] Accordingly, the trial court did not

---

[10] S nevertheless repeatedly asserts that no evidence was introduced in the trial court in support of the statutory requirement that she was in need of further treatment that could only be provided in a 180-day commitment. We disagree. The trial court record plainly reflects that treatment options less restrictive than a 180-day commitment were not appropriate for her at that time, and it logically follows that a 180-day hospitalization was the only appropriate treatment option remaining.

S also asserts that the trial court failed to meaningfully consider an LRA. Again, we disagree. As reflected by the analysis, *supra*, the court plainly considered but rejected such an alternative in light of the S' unstable condition despite her hospitalization and significant parental support while hospitalized as well as her parents' admission that they were unable to provide adequate support for her at home and her condition would likely worsen if she were discharged home.

Lastly, S contends asserts that the trial court erred because RCW 71.34.010(2) and RCW 71.34.750 require that courts offer less restrictive alternatives for treatment to children. Because

err when it ordered that S be hospitalized for up to 180 days of involuntary treatment.

Affirmed.

WE CONCUR:

---

she does not offer persuasive statutory interpretation or decisional authority in support of such a requirement and because such provisions plainly do not mandate as much, S' assertion fails.